[Crim. No. 3444.   Third Dist.   Nov. 1, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. DONALD PAUL KOELZER et al., Defendants and Appellants.

John C. Weidman for Defendants and Appellants.

Stanley Mosk, Attorney General, Doris H. Maier, Assistant Attorney General, and Raymond M. Momboisse, Deputy Attorney General, for Plaintiff and Respondent.

PIERCE, P. J.—On this appeal by both defendants from judgments of second degree burglary after a jury trial and conviction, the sole contention is that defendants were convicted through the admission of evidence discovered and obtained by an illegal search of a motor vehicle.

Appeals were also taken from the orders (1) denying probation and (2) denying defendants' motions for new trial. Said orders are nonappealable.

The search of defendant Harry Koelzer's automobile occurred after and during a chain of events which included

an arrest of both defendants. The arrests were under warrants but the warrants were on misdemeanor charges, to wit: traffic violations. The arrests were made at night, and from the record it does not appear that any magistrate had directed a night arrest. No traffic violation was being committed when the arrests were made. Therefore these arrests did not comply with Penal Code section 840.[1] Moreover, this court has held that, in the absence of other suspicious circumstances, a search made of an automobile without a search warrant may not be justified by an arrest for a traffic violation. (*People* v. *Molarius*, 146 Cal.App.2d 129 [303 P.2d 350], hearing by Supreme Court denied.) Defendants were not in the automobile when the arrests were made. It was parked, as the facts hereinafter related will show, at a point some distance from the point where the arrests were made and the search was not contemporaneous with said arrests. Therefore the legality of the search cannot be justified by the traffic violation arrests. (*Tompkins* v. *Superior Court*, 59 Cal.2d 65, 67 [27 Cal.Rptr. 889, 378 P.2d 113].)

In fact, the Attorney General does not contend that the validity of the search and resultant seizure *can* depend upon the preceding arrests; he concedes that it cannot. But defendants were also arrested for possession of burglary tools and the Attorney General's position is that the series of steps which led to an ultimate search of the automobile, the seizure of evidence and to the arrest of defendants for suspicion of burglary was divorced from, and irrelevant to, the arrest for traffic violations; and that the search which produced the latter arrest was legal because it was the culmination of an investigation reasonably and lawfully carried on by the officers in a proper performance of their duties. The following statement of facts and review of the law applicable thereto will, in our opinion, establish that this position is sound.

On May 29, 1962, a market in Davis, Yolo County, was burglarized, entry having been made by the burglars via a hole drilled through the roof. A safe had been opened and approximately $4,400 stolen. Later at the trial it was proved

---

[1]Section 840 of the Penal Code provides as follows: "If the offense charged is a felony, the arrest may be made on any day, and at any the day or night. If it is a misdemeanor, the arrest cannot be made at night, unless upon the direction of the magistrate, indorsed upon the warrant, except when the offense is committed in the presence of the arresting officer."

by the testimony of a criminologist that a wrecking bar admittedly owned by defendant Harry Koelzer contained vestiges of paint identified with that of the safe at the market which had been broken open; also that in a similar-type burglary of a market in Carmichael, bolt cutters like those belonging to said defendant had been used to cut through a lock and hasp.

The wrecking bar and bolt cutters were introduced in evidence over defendants' objection. There is other substantial evidence in the record (including a perhaps ambiguous extrajudicial admission by Harry), but an appellate court would have to say that without the objected to evidence obtainment of a conviction would have been doubtful. Therefore, affirmance or reversal rests upon determination of the question of the admissibility of this evidence. The following sequence of events led to its discovery:

At approximately 12:15 a.m. on the morning of May 31, 1962, two police officers in a prowl car with headlights turned off emerged from the alley onto 17th Street between R and S Streets in the City of Sacramento. They observed the two defendants peering into the front window of a radio shop at 1821 17th Street, neither a downtown nor general neighborhood shopping center. When the officers turned on their lights, the defendants started to walk away from the store. The policeman stopped their car near defendants, got out and asked defendants for identification. There is nothing in the record to indicate the officers connected defendants with the Yolo County burglary or even knew it had been committed. Their suspicions were aroused only because of the circumstances just described. Defendant Donald Koelzer informed the officers he had left his wallet at home on a dresser. Defendant Harry Koelzer produced a driver's license showing his home address on Barindo Drive in the northern area, 5 miles away from 17th, R and S Streets. Harry confirmed that that was his address. Donald asserted he was also staying there. Asked what they were doing at midnight without means of transportation so far away from their home, Harry asserted they were taking a walk.

The officers by radio check with police headquarters ascertained there were traffic warrants outstanding for both defendants—eight for Harry, one for Donald. The men were told they were under arrest.

Still suspicious of defendants' burglarious intentions, however, the officers continued the investigation. A search of the persons of both revealed that Harry had a pair of blue

plastic gloves, and a Volkswagen key, Donald a flashlight, a pair of brown cotton gloves and electricians' wire-cutting pliers. Regarding the gloves, Harry stated they had been cleaning bricks (a home project). The gloves, however, were innocent of brick dust or other evidence of such usage. Further questioned as to their reason to be out walking 5 miles from home, Harry stated he had been "chippying around," visiting a girl friend and that Donald had been with him. When asked the name and address of this woman, Harry stated she was Ellen and that she lived at an apartment house on 26th Street and Second Avenue. (This is 19 blocks from the point where defendants had been found "walking.")

Defendants were taken by the officers out to the address stated to check this story. Although the apartment house was there, its occupants included no Ellen and the story was demonstrably fiction.

The police had asked if either defendant had a car. Harry said that he owned a white Cadillac, but that it was at home and disabled; that they had taken a cab to "Ellen's" apartment.

Returning from Second Avenue and approaching 17th Street, while driving down S Street (one-half block from the store where defendants had first been seen), the officers noticed a white Cadillac. They stopped to determine whether it was Harry's and found it was not. They then noticed a Volkswagen flatbed pickup parked nearby and one of the officers remembered the Volkswagen key on Harry's person. Harry denied that automobile was his, but at the officer's request he produced the key which fit the door of the pickup. also the ignition lock. Harry then admitted ownership.

The officers then observed *in plain view* the following: In an open-front glove compartment a wallet (this turned out to be Donald's—thus belying his story that his identification had been left at home) ; in the cab a radio transmitter and walkie-talkie radio; on top of a canvas tarp covering the bed of the pickup, a pair of large-sized bolt cutters; also on top of the tarp an open canvas bag containing another walkie-talkie radio, a keyhole saw, a drill and bits. The officers then lifted the tarp and discovered a multitude of heavy tools, including welding equipment, sledge hammers, punches, bits, braces and wrecking bars, one of which, as stated above, was later discovered to contain chips of paint identified as that matching the marred paint of the burglarized safe.

When asked if the tools belonged to him, Donald stated: "They probably do, but see me in the morning, I'm too sleepy tonight." Asked the same thing, Harry counterquestioned: "Well, am I under arrest?" And when informed that he was he said, "I have nothing to say." Harry had theretofore described himself as a salesman of Wearever aluminum. Such an occupation did not, of course, explain the equipment. It did suggest professional burglary and safecracking.

Defendants were then taken to the police station and booked for possession of burglary tools and for traffic violations. At the trial a witness for the People, a police officer, testified that Harry, when asked who had been the instigator of the burglary, replied that "he was just as much to blame as his brother."

The foregoing recital convinces us that the search of defendants' motor vehicle was not at all the "fruit" of the traffic violation arrest, but of justified suspicion that defendants had committed, or were contemplating or about to commit, a burglary of the radio shop, suspicion reasonably engendered and given downhill-snowballing growth as questioning continued, with falsehoods added upon falsehoods, and, finally, as the investigation proceeded, suspicion which was solidified with the discovery of two walkie-talkie radios and a kit of burglars' tools *in plain view*—all of this before any search of the automobile was undertaken.

Arrests on the warrants for traffic violations as a part of this progression of events were entirely coincidental. The only significance attaching thereto is a possibility that discovery by the officers that defendants, and particularly Harry, had disregarded police notices of overparking violations, might not have assuaged the officers' suspicion that they were not dealing with law-abiding citizens. But the arrest which was the immediate byproduct of the discovery of traffic violations was otherwise irrelevant to the continued investigation for suspected burglary tools.

██ Police officers are justified in stopping and questioning persons observed peering into a store late at night at a place where casual window shopping is unusual. In fact, the added circumstance here of defendants' starting to walk away from the window as the police car's lights were turned on would have impelled such questioning as a matter of a policeman's duty. (*People* v. *Simon*, 45 Cal.2d 645, 650, 651 [290 P.2d 531]; *People* v. *Blodgett*, 46 Cal.2d 114, 117 [273

P.2d 57]; *People* v. *Mickelson,* 59 Cal.2d 448, 454 [30 Cal. Rptr. 18, 380 P.2d 658].) In *People* v. *Ambrose,* 155 Cal. App.2d 513 [318 P.2d 181] (petition by Supreme Court denied) the facts had partial similarity to those here in that there officers observed a man walking at night, who was stopped and questioned and who gave false information. He had a flashlight, a pair of gloves, a screwdriver, and two paper bags on his person. The opinion (by Justice White) states (on p. 522):

". . . . We entertain no doubt that knowing of recent burglaries in the neighborhood they [the officers] were justified in concluding that a person carrying a flashlight and a pair of pigskin gloves was a suspicious person and they were entitled to question such person. Indeed, from the foregoing facts before the officers, coupled with the inferences reasonably to be drawn therefrom, there can be no doubt as to the reasonableness, but also as to the necessity for arrest. [Citations].''

The police officers here having reasonably stopped and questioned defendants with reasonable suspicion aroused that a burglary either might have been, or was about to be, committed, were also entitled to make a ''self-protective'' search of defendants' persons. (*People* v. *Mickelson, supra,* at p. 454; *People* v. *Martin,* 46 Cal.2d 106, 108 [293 P.2d 52].) This is a rule of necessity to which a right even as basic as that of privacy must bow. To rule otherwise would be inhumanely to add another hazard to an already very dangerous occupation. Our zeal to fend off encroachments upon the right of privacy must be tempered by remembrance that ours is a government of laws to preserve which we require law enforcement officers—live ones. Without becoming a police state, we may still protect the policeman's status.

Nor were the officers unreasonable in taking defendants to the apartment on 26th Street to check out Harry's self-condemning story of philandering, an excursion incidentally to which defendants offered no protest. (See *People* v. *Parham,* 60 Cal.2d 378, at p. 383 [33 Cal.Rptr. 497, 384 P.2d 1001].)

The circumstances above related would themselves have justified the subsequent search of the motor vehicle. But when that search was made the officers had much more: They had found the Volkswagen, the existence of which had been falsely denied; they had found it one-half block from the scene of the assumed burglary; they had ascertained the car belonged to Harry; and they had found Donald's wallet and

further equipment, usable by burglars, including a kit of tools, *all in plain sight.* This did not constitute a search (*Ker* v. *State of California,* 374 U.S. 23, 43 [83 S.Ct. 1623, 10 L.Ed. 2d 726, 740]; *People* v. *Zapata,* (1963) 220 Cal.App.2d 903, at p. 910 [34 Cal.Rptr. 171]; *People* v. *West,* 144 Cal.App. 2d 214, at pp. 219-220 [300 P.2d 729].)

We will not assert that at this point the officers were required to say to defendants: "Now you boys wait right here while we go find a magistrate and get a search warrant which will permit us to lift the tarp and find what is beneath it." Such quixotisms of police procedure befit a Gilbert and Sullivan operetta libretto, not the serious business of real-life police investigation.

Defendants assert that "a search cannot be justified by what it turns up." This rule exists and also the rule that an arrest cannot be used as the pretext for a search. (*People* v. *Haven,* 59 Cal.2d 713, 719 [31 Cal.Rptr. 47, 381 P.2d 927]; *Tompkins* v. *Superior Court, supra,* 59 Cal.2d 65, 67.) But these rules do not apply here. The fact that a search precedes an arrest (here, the arrest for possession of burglary tools followed the search) does not invalidate a search made upon reasonable cause (*People* v. *Zapata, supra,* at p. 910) and the point of reasonable cause had certainly been reached here when, as the last step, the search was made.

Nor was the arrest for the traffic violations a mere pretext for the search. From what has been stated above, it must be abundantly clear that the officers neither pursued their investigation, nor ultimately made their search, using the traffic warrants as an excuse. On the contrary, it is impossible for us to reach any other conclusion than that all questions asked, and all steps taken, by the police officers, as outlined above, would have been exactly the same regardless of the traffic violations arrest.

Was said arrest, nevertheless, a fortuitous windfall for defendants, as the result of which they must be given impunity for their crime notwithstanding the lack of any causal connection between the arrest, the search and the evidence turned up thereby? So to hold would not be to preserve any constitutional guaranty, it would only serve to penalize the state. Assuming that the officers violated Penal Code section 840, what of it? The purpose of the exclusionary rule (where it is applicable) is not to punish the state for the blunders of its constabulary. It is to prevent the courts from being a party to the "dirty business" of illegal evidence collection, thus discouraging such practices for the future

protection of all citizens in the enjoyment of their bill of rights. (*People* v. *Cahan*, 44 Cal.2d 434 [282 P.2d 905, 50 A.L.R.2d 513].) Here the actually not-so-very "dirty business" of the night arrest on the traffic violation warrants seems to us to have no privity with the court's admission in evidence of the burglary paraphernalia; so that the court by admitting it does not become a party thereto.

An illegal arrest does not render *all* evidence inadmissible (thus effectually granting absolution for the crime). It only poisons the fruit of the arrest, i.e., the evidence which is the product thereof. (*People* v. *Parham, supra.*) Not even an involuntary confession causes the rejection of all evidence which *follows it*; only that which flows from it. (*People* v. *Ditson*, 57 Cal.2d 415, 442 [20 Cal.Rptr. 165, 369 P.2d 714].)

We hold, therefore, that the evidence objected to was properly admitted as having been seized during a search made by the police officers upon reasonable cause and that the coincidental but inconsequential arrest on a warrant for a traffic violation (assuming it to have been illegal) did not render the search illegal.

Stated in another way, we hold that evidence to be admissible must be the product of a search incident to (but not necessarily following) a lawful arrest. To be a lawful arrest facts and circumstances within the officers' knowledge, lawfully obtained, must be sufficient to warrant men of reasonable caution to believe an offense has been or is about to be committed by the persons arrested. (*Ker* v. *State of California*, 374 U.S. 23, 34, 35 [83 S.Ct. 1623, 10 L.Ed.2d 726, 739].) But the fact that another illegal arrest had preceded that which was lawful does not. taint, spoil, and destroy validity of the search, when such illegal arrest is not the inducing basis of the obtainment of the justifying knowledge.

The appeals from the orders denying probation and denying motions for new trial are dismissed.

The judgments are affirmed.

Schottky, J., and Friedman, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied December 30, 1963. Peters, J., was of the opinion that the petition should be granted.