[Crim. No. 260. Fifth Dist. June 27, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. ROBERT A. McVEY, Defendant and Appellant.

Jerry L. Guthrie, under appointment by the District Court of Appeal, for Defendant and Appellant.

216

Thomas C. Lynch, Attorney General, Raymond M. Momboisse and David L. Kelly, Deputy Attorneys General, for Plaintiff and Respondent.

CONLEY, P. J.—The defendant and a companion were accused in the information of burglarizing the Hornet Drive-In located at 2336 Fair Oaks Boulevard in Sacramento. The burglars entered the restaurant by forcing one of the doors during the nighttime; they stole a miscellaneous lot of personal property, including a novelty vending machine, an FM/AM radio, a public address system and amplifier, four or five pounds of bacon, a box of frozen cube steaks, and a canned Dubuque ham. On the appeal, it is not claimed that the burglary did not occur as charged. The appeal is based wholly on a contention that the Sacramento deputy sheriffs did not catch the defendant legitimately, and that evidence was improperly admitted of the result of what is claimed to have been an illegal arrest followed by an incidental search.

It will not be necessary to devote any time to the details of the crime itself; it is not questioned that it was committed by the defendant, and he was convicted of burglary in the second degree. If there is to be a reversal, it must be on the ground that the arrest and the contemporaneous search of the van driven by defendant which contained stolen property of the Hornet Drive-In constituted fatal errors.

On the night of March 31, 1965, Edward E. Calvert, deputy sheriff of Sacramento County, like so many of his fellows throughout the length and breadth of the land, was carrying on the onerous but necessary duty of patrolling an area where there had recently been numerous burglaries. At approximately 11:45 o'clock at night, in a highly exclusive residential area, on the American River Drive near the Watt Avenue bridge, his attention was called to the suspicious circumstance of a dilapidated van with no lettering on the side rushing through the area at a speed of from 40 to 45 miles per hour, in a 25-mile-per-hour zone. After observing his required duty of advising the central police control on his radio, he put on his red lights, sounded his siren, and followed the careening van. While it did not immediately stop, it finally did. He got out of the police car and approached the driver's side of the van. He saw no one behind the wheel. There was a scurrying noise in the van, and finally both the driver and a passenger got out of the vehicle on its right side rather than on the driver's side. The two occupants walked

down the right side of the van from the point where they descended to the rear of the vehicle where Deputy Calvert met them. At his request for identification, each of them exhibited a driver's license and defendant handed him a draft card. He told them to step back to the police vehicle, that he was making "a routine check," and he then went back to his own car, called headquarters and ascertained that there was no outstanding warrant for either of the parties. Officer Calvert asked the defendant what they were doing prior to being stopped, and McVey stated that his boss had permitted the use of the van and he was just showing his passenger Carpenter how it operated. At about this time, Detective Hosang joined Deputy Calvert; he turned his flashlight upon the glass panel of the rear door, and his exclamation caused Calvert to do likewise, at which time he saw a vending machine and a box on which rested a can of Dubuque ham. The officers asked McVey, who had admitted driving the van, what the occasion for carrying this property was and where they had gotten it. McVey said he did not know anything about it. This combination of suspicious circumstances, the driving at an illegal speed of an unlettered, dilapidated van through an exclusively residential district where it could not possibly have any business at a late hour of the night, the scurrying noise in the van when it finally stopped, the alighting of the driver and his companion on the right side of the vehicle, the strange statement that McVey was only showing Carpenter how the van should be run, the clear evidence that unusual property was located in the van, accompanied by the denial of McVey, the driver, that he had the slightest knowledge of how it got there, were so persuasive that something was wrong and that a crime had been committed that the officers were, in our opinion, justified in arresting the two participants on suspicion of burglary. A safety search of the two men then produced an open pocket knife in Carpenter's shirt pocket.

As an incident of this proper and lawful arrest, the officers then searched the van and in addition to the property already mentioned which was in full view and concerning which evidence would have been admissible (*People* v. *Koelzer,* 222 Cal.App.2d 20, 27-28 [34 Cal.Rptr. 718]; *People* v. *Terry,* 61 Cal.2d 137, 152 [37 Cal.Rptr. 605, 390 P.2d 381]; *Mardis* v. *Superior Court,* 218 Cal.App.2d 70, 74 [32 Cal.Rptr. 263]; *People* v. *Alvarez,* 236 Cal.App.2d 106, 112 [45 Cal.Rptr. 721]; *People* v. *Davis,* 222 Cal.App.2d 75, 78 [34 Cal.Rptr.

796]; *People* v. *McLaine,* 204 Cal.App.2d 96, 101-102 [22 Cal.Rptr. 72]; *People* v. *Mosco,* 214 Cal.App.2d 581, 583 [29 Cal.Rptr. 644]), there were found four pairs of gloves, a bolt cutter, a pair of homemade brass knuckles, an FM/AM radio, a public address system, an amplifier, a box of cube steaks, which were still frozen, and four or five pounds of bacon. Shortly after the defendants were taken to police headquarters and booked for investigation of burglary, another member of the Sacramento County sheriff's office, Inspector Bristo, having received directions from headquarters to conduct a search to ascertain what small restaurant or drive-in in the vicinity had been burglarized, located the situs of the crime at the Hornet Drive-In at 2336 Fair Oaks Boulevard. He there found a lug wrench with some white substance on it; the door which had been "jimmied" was painted white; it was partly open and a light was shining in the restaurant; the cash drawer was open, and meat and other food stuffs were scattered over the floor. The proprietor of the drive-in, Malcolm L. Huckleberry, Sr., and his son, Malcolm H. Huckleberry, Jr., came to the burglarized drive-in at the request of the police, and, after verifying the details of missing goods, went to police headquarters where they identified the stolen property found in the van driven by the defendant.

Incidentally, it was developed at the trial from Antonio A. Rodriquez, the owner of the van, that the defendant McVey had been working for him as an installer of lawn sprinklers and that he had permitted him to use the vehicle solely in the course of his business but without giving him the right to drive it at night or for his own purposes.

▮ The original stopping of the van was fully justified. The rule is thus stated in *People* v. *Mickelson,* 59 Cal.2d 448, 450 [30 Cal.Rptr. 18, 380 P.2d 658] : "In this state, however, we have consistently held that circumstances short of probable cause to make an arrest may still justify an officer's stopping pedestrians or motorists on the streets for questioning. If the circumstances warrant it, he may in self-protection request a suspect to alight from an automobile or to submit to a superficial search for concealed weapons. Should the investigation then reveal probable cause to make an arrest, the officer may arrest the suspect and conduct a reasonable incidental search. [Citing cases.]"

It is clear that if the police are to carry out the historic and necessary function of patrolling the streets at night, they must have some such rule of action. ▮ To see a dilapidated

van moving at illegal speed late at night in an area where there are no apparent reasons for such activity is itself a suspicious circumstance. Therefore, the stopping of the van in which the burglars were moving the stolen property was legitimate. (*People* v. *Blodgett*, 46 Cal.2d 114, 117 [293 P.2d 57]; *People* v. *Simon*, 45 Cal.2d 645, 650 [290 P.2d 531].)

 After the initial stopping of the van, was the arrest justified? Section 836 of the Penal Code provides as follows: "A peace officer may make an arrest in obedience to a warrant, or may, without a warrant, arrest a person:

"1. Whenever he has reasonable cause to believe that the person to be arrested has committed a public offense in his presence.

"2. When a person arrested has committed a felony, although not in his presence.

"3. Whenever he has reasonable cause to believe that the person to be arrested has committed a felony, whether or not a felony has in fact been committed."

As previously indicated, the officer by direct observation had "reasonable cause to believe that the person to be arrested [had] committed a public offense in his presence" by exceeding the speed limit applicable to the portion of the residential section of Sacramento where he was traveling. (Veh. Code, § 22352, subd. (b)(1).) The appellant, however, contends that the record indicates that the officer did not intend to make an arrest for exceeding the speed limit. In any event, he did have the right to make the arrest on that ground. But passing by that legitimate reason for effecting an arrest of McVey, we come to the third subdivision of section 836, Penal Code, and must inquire whether at the time of the arrest the officer had "reasonable cause to believe that the person to be arrested [had] committed a felony, whether or not a felony [had] in fact been committed."

At the time of the arrest, it appeared that in all likelihood the occupants of the truck had been guilty of a burglary, and that there was probable cause to arrest the defendant and his companion. They had already acted suspiciously by driving as they did. After being stopped, there was a scurrying noise in the automobile in which they were seated, and both occupants finally got out on the right-hand side of the vehicle. The contents of the van, which could be observed in plain sight when the flashlight beam was directed into the body of the vehicle, consisted of items of personal property which were most unusual at that time of night outside of a restaurant or

drive-in. A novelty vending machine is not an object which then would ordinarily be found in any place except an eating establishment, and the Dubuque ham similarly would be customarily appurtenant at that time of night only to a restaurant's reserve of food. When McVey, the driver, was asked how these articles got into the van, he professed total ignorance. That in itself, from the standpoint of a reasonable man, was equivalent in effect to a confession of wrong-doing. It should be remembered also that when McVey was faced with the question asked by the police, he could not possibly know just how much had been seen by the officers through the rear window of the van. He might well have assumed that the officers had also noticed the frozen beef steaks, the bacon, and other food stuffs stolen from the Hornet Drive-In, the massive bolt cutter, and the brass knuckles. The device used by McVey to evade an answer to the fair inquiries of the policemen was a tell-tale indication of guilt.

It cannot reasonably be said that a peace officer has no right to make an arrest in circumstances such as these which would carry forceably to his mind the probability of a felonious breach of the law. In 5 California Jurisprudence 2d, Arrest, section 10, at page 158, it is said: "The general rule is that to constitute probable or reasonable cause that will justify one in arresting another on a criminal charge, there must be a state of facts that would lead a man of ordinary care and prudence to believe, or entertain an honest and strong suspicion, that the person arrested is guilty." Each case must be determined on its own facts. Among the many cases which hold an arrest justified in circumstances similar to those developed in the present instance are the following: *People* v. *Ingle,* 53 Cal.2d 407, 412-415 [2 Cal.Rptr. 4, 348 P.2d 577]; *People* v. *Rios,* 46 Cal.2d 297 [294 P.2d 39]; *People* v. *Kilvington,* 104 Cal. 86, 92 [37 P. 799]; *People* v. *Fischer,* 49 Cal.2d 442, 446 [317 P.2d 967]; *People* v. *Boyles,* 45 Cal.2d 652, 655 [290 P.2d 535]; *People* v. *Smith,* 50 Cal.2d 149, 151 [323 P.2d 435]; *People* v. *Odegard,* 203 Cal.App.2d 427, 430-431 [21 Cal.Rptr. 515]; *People* v. *Gilmore,* 211 Cal.App.2d 35, 38-39 [27 Cal.Rptr. 59]; *People* v. *Poole,* 174 Cal.App.2d 57, 60-61 [344 P.2d 30]; *People* v. *Evans,* 175 Cal.App.2d 274 [345 P.2d 947]; *People* v. *Smith,* 141 Cal.App.2d 399, 402-403 [296 P.2d 913]; *People* v. *Shannon,* 147 Cal.App.2d 300 [305 P.2d 101]; *People* v. *Brown,* 147 Cal.App.2d 352, 356 [305 P.2d 126].

If the policemen were required to turn loose all persons

who indicated that they had been lawbreakers, as these defendants did on this midnight occasion, the enforcement of our criminal law would indeed be laggard. Believing that the arrest for investigation of burglary was fully justified and that the search, which was a reasonable accompaniment of the arrest, was proper (*Ker* v. *State of California,* 374 U.S. 23 [83 S.Ct. 1623, 10 L.Ed.2d 726]; *People* v. *Winston,* 46 Cal.2d 151, 162 [293 P.2d 40]; *In re Dixon,* 41 Cal.2d 756, 761-762 [264 P.2d 513]; *People* v. *Ingle, supra,* 53 Cal.2d 407, 412-413; *People* v. *Torres,* 56 Cal.2d 864, 866 [17 Cal.Rptr. 495, 366 P.2d 823]; *People* v. *Machel,* 234 Cal.App.2d 37, 47-48 [44 Cal.Rptr. 126]), we cannot adopt appellant's view that the questioned evidence was inadmissible.

The judgment is affirmed.

Stone, J., and McMurray, J. pro tem.,* concurred.

---

*Assigned by the Chairman of the Judicial Council.