[Crim. No. 11938.   Second Dist., Div. Two.   Feb. 1, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. JULIO MENA GARCIA et al., Defendants and Appellants.

Henry P. Crabtree, under appointment by the Court of Appeal, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, Edward P. O'Brien and Jackson L. Smith, Deputy Attorneys General, for Plaintiff and Respondent.

HERNDON, J.—Julio Garcia and Frank Ramirez appeal from judgments convicting them of possessing heroin in violation of section 11500 of the Health and Safety Code.

### Assignments of Error

Appellant Garcia argues two contentions: (1) that the incriminating evidence was erroneously admitted in violation of the rules enunciated in *Bielicki* v. *Superior Court,* 57 Cal.2d 602 [21 Cal.Rptr. 552, 371 P.2d 288], in that such evidence was the fruit of an unreasonable search in the course of which the officers, looking through an open basement window, saw appellant Garcia in the act of inserting a hypodermic needle into his arm; and (2) that the evidence does not support the judgment for the reason that the quantity of heroin remaining after Garcia had completed the injection observed by the officers was too small an amount to be usable. Appellant Ramirez makes the additional contention that in any event the evidence was insufficient to prove that he at any time had exercised, or had the right to exercise, dominion and control over any of the contraband.

### Summary of the Evidence

Officer Mallette of the Los Angeles Police Department testified that at approximately 3:05 a.m. on September 9, 1965, he

and a fellow officer were stopped at the corner of Bellevue and Sunset by a private citizen whose name he could not recall but which he had entered on his field activities log and on a field interrogation card which were on file at the central division headquarters. By way of explaining the reason for the actions subsequently taken, Officer Mallette testified as follows:

"[This citizen] stated that he observed some people down in the basement at 1122 and ½ Bellevue using narcotics. . . . [M]y partner and myself and the citizen, went to this location that was pointed out by the citizen, which was located on the south side of the building near the back. . . . The citizen pointed to a window, stated that the two defendants were sitting in the basement— . . . Myself and my partner then looked through this window, which was open, . . . We observed the two defendants, Ramirez and Garcia, sitting at a table approximately 20 feet from the window. . . . The defendant Ramirez was sitting there at one end of the table and the defendant Garcia was holding up what appeared to be a syringe and a needle, up to the light, a light which was hanging over the table. . . . Well, he then put his right arm on his knee and appeared to be putting the needle into his arm. . . . [W]e then backed away from the window and walked around to the rear of the house and found an open door leading into the basement, through which we could clearly see the two defendants again sitting at this table. And we walked into the basement and up to the defendants and found the defendants and found the burnt spoon, the needle, and a wad of cotton, and a piece of U.S. currency, and a rag lying on the table." He also testified that the defendants were then placed under arrest and advised of their constitutional rights.

The building in which appellants were observed was described as a multiple family tenement house located adjacent to a vacant lot. The basement window referred to by the officer was visible from the street and the officers were standing on the vacant lot when they made their observations through the basement window.

The officers seized the described paraphernalia which they found on the table in front of the appellants and it was received in evidence at the trial. The chemist called as an expert witness described the spoon and its contents as follows: "A. It is a spoon with a residue in the bowl. Q. Would you describe this residue for the Court, sir? A. It is a whitish residue that is charred a little bit and it is very sticky. Q. Did

you make an analysis of that residue, sir? A. Yes, I did. Q. A chemical analysis was that? A. Correct. Q. Did you form some opinion as to what that residue contained? A. Yes, I did. Q. What was that opinion, sir? A. The result of the analysis showed the substance to be heroin, or chemically known as diacetylmorphine. Q. Do you have some opinion as to how much heroin there is in that spoon, sir? A. My estimate is approximately three grains. Q. All right. How much is that in milligrams? A. Well, there is 15.4 grains to a gram, and 1000 milligrams in a gram, so I would have to calculate—the three grains is one-fifth, and 15.4 grains in a gram, so that would be one-fifth of a gram or 200 milligrams.''

### There Was No Unreasonable Search

■ The rules enunciated in *Bielicki* v. *Superior Court, supra*, 57 Cal.2d 602, relied upon by appellants, are wholly inapplicable in the instant case. As the Supreme Court carefully pointed out at pages 606 and 607 of the cited decision, the police action therein condemned involved the general exploratory observations of a rest room made surreptitiously by an officer looking through a pipe installed upon the roof of the building above the rest room ''which was certainly not a portion of the premises that was open to the general public—and from that vantage point secretly observed activities of petitioners which no member of the public could have seen, as they were carried on within the confines of toilet booths each enclosed by three walls and a door.''

And, further paraphrasing the language of *Bielicki* at page 608, the observations there condemned were made at a time when the officer had no reasonable cause to believe that someone on the premises had committed a felony and without any information justifying the questioning of anyone on the premises ''with respect to his part in recently observed or reported criminal activity.'' The decision in *Bielicki* recognizes and approves ''the settled rule that 'looking through a window does not constitute an unreasonable search' (*People* v. *Martin* (1955) 45 Cal.2d 755, 762 [13] [290 P.2d 855], and cases there cited).'' (See page 607.)

■ Since in the instant case the officers *did* have good and sufficient reason to investigate the report of criminal activities made to them by a private citizen and since their visual observations were made through an open window from a vacant lot which adjoined the site of the building in question, it is clear that 'there was no substantial, if any, degree of privacy to

the area." (*People* v. *Willard,* 238 Cal.App.2d 292, 307 [47 Cal.Rptr. 734], and cases cited and analyzed therein.) In the last cited decision, which involved a very similar factual situation, the court rejected the same contention as that here advanced by appellants and concluded (pages 307-308) with the following language which applies with equal force to the case at bench: "We conclude that, in the light of all the circumstances, Sergeant Hilliard at the time he made the observations in question was not on premises constitutionally protected, that his looking through the door and window did not constitute an unreasonable search, and that his conduct was not an unlawful invasion of defendant's privacy. Since he saw defendant committing the offense charged, he could lawfully arrest him without a warrant (Pen. Code, § 836, subd. 1). The evidence obtained was the product of such lawful arrest. Such being the case, there was reasonable cause to hold defendant to answer. (*People* v. *Nagle* (1944) 25 Cal.2d 216, 222 [153 P.2d 344].)"

*The Evidence Establishes That Appellant
Garcia Was In Knowing Possession of a
Usable Quantity of Heroin Immediately
Prior to His Arrest.*

█ It is stating a truism to say that the narcotic which Garcia possessed and used must have been a usable quantity. Whether the 200 milligrams of residue contained a usable quantity of the heroin is a moot question in this case so far as he is concerned.

In *People* v. *Leal,* 64 Cal.2d 504 [50 Cal.Rptr. 777, 413 P.2d 665], our Supreme Court approved the rationale of this court's decision in *People* v. *Sullivan,* 234 Cal.App.2d 562 [44 Cal.Rptr. 524], in which, as the Supreme Court observed, we "reversed the conviction, stating that [*People* v. *Aguilar,* 223 Cal.App.2d 119 (35 Cal.Rptr. 516)] clearly establishes that knowing possession cannot be predicated upon *the presence of such traces* and concluding that section 11500 has no application to the *possession* of *such* minute quantities." (Italics added.) (*People* v. *Leal, supra,* p. 510.) Contrary to appellant Garcia's contentions herein, the court in *Leal* did not hold that a possessor of narcotics may escape conviction solely by reason of the fact that he has succeeded in disposing of the bulk of the contraband moments before his apprehension.

Thus, the court in *Leal* discussed the considerations underlying the rule that mere possession of non-usable narcotic

debris or residue is insufficient to sustain a conviction under section 11500 in the following language: "The most compelling explanation for the vast disparity between the punishments annexed to sections 11500 and 11555 is that section 11500 applies to those who by their possession of narcotic substances have created a potentiality for future use or sale. Whether a defendant who possesses only minute traces of narcotics residue creates such potentiality is purely a question of fact which the prosecution must prove.

"We do not say, however, that the discovery of traces of narcotics in a defendant's possession is without legal significance. Clearly, the presence of those traces may serve as evidence in the proof of many types of narcotics offenses.

"We conclude that the statutory differentiation of the various crimes as well as the history of the cases culminating in *Sullivan* show that in penalizing a person who possesses a narcotic the Legislature proscribed possession of a substance that has a narcotic potential; it condemned the commodity that could be used as such. It did not refer to *useless* traces or residue of such substance. Hence the possession of a minute crystalline residue of narcotic useless for either sale or consumption, as *Sullivan* points out, does not constitute sufficient evidence *in itself* to sustain a conviction. Since in the present case the prosecution *proved no more* than defendant's possession *of traces of narcotics* and did not show that *such residue* was usable for sale or consumption, we remit it to the trial court for the purpose of ascertaining whether or not such factual elements were present." (Italics added in part.) (Pp. 511-512.)

In the instant case when the officers looked into the basement occupied by appellants and saw Garcia holding a homemade syringe and needle up to the light, they had every reason to believe that he was then in possession of a quantity of narcotics sufficient for present or future use and that he presently intended to put it to that use. The accuracy of this belief, of course, was immediately confirmed when Garcia was seen to insert the needle into his arm. There can be no reasonable doubt that when first observed by the officers, Garcia possessed a quantity of contraband narcotics sufficient for future use since he demonstrated its "narcotic potential" by in fact using it. His conviction, therefore, does not rest upon the *possession of the residue* remaining at the instant of his arrest but rather upon his observed possession of usable quantities of contraband immediately prior thereto. The residue

merely served to conclusively establish the narcotic nature of the material whose flagrante delicto possession was observed by the police.

That is to say, the chemical establishment of the heroin residue on the burnt spoon eliminates any possible support for the contention made in appellants' closing brief that ''For all that appears in this record, appellant Garcia could have been injecting himself with insulin.'' Of course, the nature of the other articles found in appellants' possession are equally incompatible with an insulin injection, i.e., a long filthy rag suitable for use as a tourniquet, a homemade ''outfit'' consisting of an eye dropper bound with a rubber band to a bulb and attached to a loose needle, a burnt spoon, etc., but standing alone such items would not establish to a certainty that the substance Garcia possessed and used was a specific proscribed narcotic.

Although not expressly and definitely enunciated by appellants, the theory underlying their argument seems to be that the Legislature, by segregating various offenses relating to prohibited narcotics and the paraphernalia associated with their use, intended to promulgate a rule that would preclude the conviction upon a charge of possession of a person discovered to be in possession of a usable quantity of contraband if, as the result of his own efforts, he was able to place all but a small unusable quantity thereof beyond the reach of the police before he could be effectively prevented from disposing of the physical evidence. We are unable to perceive any such legislative intent.

The cases are legion in which defendants caught in the act of possessing contraband have sought to dispose of the evidence by flushing it down a toilet, casting it from a moving automobile, swallowing it or otherwise making it permanently unavailable for *future* use. Such efforts to spare the public the dangers that otherwise would be inherent in their continued ''possession of a substance that has a narcotic potential'' have never been deemed sufficiently laudable to be rewarded with judicial approval.

While it is true that in the instant case appellant Garcia's disposition of the contraband does not appear to have resulted from his awareness of the presence of the police, such circumstance does not detract from the simple fact that he had been discovered in possession of heroin in violation of section 11500 of the Health and Safety Code at the time the officers first observed him. If the officers had arrived upon the scene a few

moments earlier so that they might have effected their entry before he had completed his injection, his culpability would have been no greater and the need for enforcement of the law in order to protect the public against the evils and dangers of narcotics would have been the same.

Appellants' argument makes appropriate the observation made by Justice Pierce in *People* v. *Koelzer*, 222 Cal.App.2d 20, 28 [34 Cal.Rptr. 718], in connection with a different, but similarly unreasonable, contention: "Such quixotisms of police procedure befit a Gilbert and Sullivan operetta libretto, not the serious business of real-life police investigation."

However, we agree with appellant Ramirez' contention that the evidence was insufficient to establish that he had any dominion or control, or the right to exercise any such dominion or control, over the contraband which Garcia was seen to possess and to inject into his arm or that which remained in the spoon. There was no evidence that appellant Ramirez' arms or his general physical condition displayed any of the indicia or characteristics associated with the use of narcotics. There was no evidence that Ramirez had ever used narcotics at any time in the past or that he had made any statements indicative of an intent to use narcotics on the present occasion. Of course, it is possible that Ramirez might have been guilty of a violation of section 11556 of the Health and Safety Code[1] even if he merely observed his friend making use of his own narcotics.

The judgment is affirmed as to appellant Garcia and reversed as to appellant Ramirez.

Roth, P. J., and Fleming, J., concurred.

A petition for a rehearing was denied February 24, 1967, and the petition of appellant Garcia for a hearing by the Supreme Court was denied March 29, 1967.

---

[1] Section 11556 of the Health and Safety Code reads as follows: "It is unlawful to visit or to be in any room or place where any narcotics are being unlawfully smoked or used with knowledge that such activity is occurring."