[Crim. No. 303.   Fifth Dist.   Aug. 30, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. JOHN M. CERDA, Defendant and Appellant.

Roslyn Robbins Dienstein, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, Raymond M. Momboisse and Jack R. Winkler, Deputy Attorneys General, for Plaintiff and Respondent.

CONLEY, P. J.—The defendant, John M. Cerda, was convicted by a jury of two counts of forgery (Pen. Code, § 470), and a third count of possession of a fictitious check with intent to pass it. (Pen. Code, § 475a.) The record shows that he and a codefendant, Robert Richard Lopez, concocted what they apparently thought was a well-organized plan to issue numerous forged checks in the Bakersfield area. Unhappily for the defendants, they did not reckon on the efficient working of the Bakersfield Police Department and the faith in local law enforcement agents of the owners of business establishments who were damaged.

Several felonies preceded those for which convictions were secured. The Star Automatic Transmission Company in Bakersfield was burglarized over a weekend and among the articles stolen was a Paymaster check protector. The burglary was discovered by the owner, Mr. Edward F. Wolf, when he opened his place of business on Monday, May 2. This check writer, serial number 3702809, later turned up in the posses-

sion of the defendants and was received in evidence. Mr. Wolf testified that on the Thursday before the burglary three men had come to his place of business in a 1957 Pontiac, which he thought was maroon in color, and one of these was the defendant Cerda, whom he had previously known.

Another burglary in the Bakersfield area followed on May 4. When Robert Hiebert of Hiebert's Wheel and Brake Shop opened his store on the morning of May 5, 1966, he noticed that the desk drawers in the office desk were open, the window in the waiting room had been broken and glass was scattered throughout the room. The burglar, or burglars, had stolen his check book; it was a loose-leaf type of book, the inserted checks, being three to a page consecutively numbered, were drawn on the main branch of the Community National Bank in Bakersfield. All printed checks contained both the business name and business address of the shop, and were numbered consecutively from 1001 to 1300. Approximately three hundred checks were stolen. Among the significant checks introduced at the trial were checks numbered 1032, 1030, 1024, and 1019. The check book was ultimately found, after Cerda's arrest, in his room; several numbered checks were missing, including the foregoing.

The owner of The Food Spot Market in Bakersfield, John Lindley, testified that on May 5, 1966, he was working at the check stand of the grocery store when two men of Mexican descent approached after picking up $8 or $10 worth of groceries from the shelves; they put the groceries on the cash register stand, and presented one of the Hiebert checks, later identified by Officer Munoz as the Hiebert check numbered 1032. The payee was Joe M. Melendez and the signature of the owner was pretended to be that of Robert Hiebert. Mr. Lindley asked the purported purchasers for identification. He was shown a health club card, bearing the name of Joe M. Melendez, the specified payee. Mr. Lindley requested a driver's license, but as the party said he did not have one with him, Lindley went into the back room and made a telephone call to Hiebert's Wheel and Brake Shop. Mr. Hiebert told him that he had not signed the check and that his shop had been burglarized. When the grocery man returned to the check stand, he found that the two purported purchasers had left. Mr. Lindley then called the Bakersfield Police Department, and Officer Munoz came to the store within a few minutes.

Mr. Munoz, a little later, brought some photographs to the store and out of the group of seven or eight Mr. Lindley

picked Lopez as being one of the men who had attempted to cash the check. Lindley showed Officer Munoz a house at 1019 East Third Street, which had been pointed out to him. Mr. Munoz had prior knowledge that one Robert Lopez lived at that address; he testified that the police department put out a broadcast describing the color of the car used by Lopez as pink or salmon colored and that it was a Pontiac which had a partial temporary plate on it; on a previous occasion he had stopped Lopez in his car because it did not have license plates on it, and he was thus familiar with the appearance of the automobile.

Later, on May 5, 1966, a person of Spanish or Mexican descent came up to the counter where Mary Sinichko was working in Bruce's Discount House and asked her to cash a Hiebert check for $186.42 dated May 4; the payee's name was Joe M. Melendez; it was apparently signed by Robert Hiebert; when she asked for identification, he showed a gun permit, a Selective Service card, and a temporary driver's license, all in the name of Joe Melendez. Mrs. Sinichko noticed that the man who presented the check had a tattoo of a bug or spider on his right arm above the wrist; that he was about 5 feet 9 inches in height and of Mexican descent. Mrs. Abraham, wife of the owner of the store, who was in the office with Mrs. Sinichko, directed her to cash the check for the full amount; $186.42 was paid to the person who purported to be Joe M. Melendez; he indorsed the check in the Melendez name in the presence of the two women.

Claud Yeargan, an officer with 10 years experience in the Bakersfield Police Department, had, in the course of his duty, visited The Food Spot Market and The Miracle Market, where an attempt had also been made to cash a check, and also Bruce's Discount House, from which he had pieced together an account of duplicate Mexican males and the automobile which they had used. In his police car, he passed the 1000 Block on East Third Street at about 8:30 p.m. He observed a pink or salmon-colored 1957 Pontiac parked in front of the house at 1019 East Third Street; one person sat on the passenger side of the car, which was facing east, while the police car was passing in a westerly direction. As Officer Yeargan went by the house, he noticed that another man got into the driver's side of the car. and it then started to leave the area. The officer made a "U" turn and followed the vehicle as it moved north onto Augusta Street. Officer Yeargan stopped the Pontiac on Virginia Street; he saw that there was no license

plate on the rear of the vehicle. The driver of the Pontiac got out of the automobile and walked back to meet the officer; he was asked for his driver's license, and when he removed the wallet from his pocket he looked into it and said he did not have his license with him but had left it at home. The officer asked his name and he admitted that it was Robert Lopez. Officer Yeargan then asked Mr. Lopez to sit on the passenger side of his police car and he radioed for assistance.

Lopez had his wallet in his hand; he took money out of it, as well as some papers, and he was making waving motions with the wallet and its contents, causing the officer to think he might be attempting to toss some money or the wallet out of the open window; however, Lopez only threw one paper out of the window.

Officers Netherton and Henkle soon arrived. When Henkle got into the police car with Lopez, and Officer Yeargan looked outside the car and found an insurance company card in the street below the window, he asked Lopez why he dropped it; the latter specifically denied that he had done so.

Officer Yeargan had prior information, by official briefing, that an attempt had been made at The Food Spot Market to pass a check which had been taken in a burglary from Hiebert's Wheel and Brake Shop; that a suspect, Robert Lopez, had been named as a participant, that a description of his automobile had been given as a pinkish-colored Oldsmobile which had a temporary license number, and that the Lopez home address was 1019 East Third Street. When the officer had gone to Bruce's Discount House with this information, he was also given supplemental information including a partial description of the man who cashed one of the checks there.

At the trial there was an objection to the introduction of evidence secured by Officer Netherton on the ground of lack of probable cause. Outside the presence of the jury the judge determined, after lengthy testimony, that the evidence should be admitted and so ruled.

Netherton testified that when he arrived at the scene, he asked Yeargan what he wanted him to do, and he said, "Watch the fellow in the front. Watch Mr. Cerda." Netherton then asked Cerda for some identification; Cerda gave him a draft card and a Social Security card with the name John Cerda on them. Netherton asked if he had further identification. As Cerda was looking through his wallet, the officer had the flashlight shining into it and among the contents was what appeared to be a folded check. The officer then asked Cerda to

place all of his papers on the seat. When Cerda did this, the officer picked up the folded paper, opened it and saw that it was a filled-out Hiebert check. The check was in the name of Joe M. Melendez and made out for $156.42. The request for further identification was allowable under the law, and the observation of the things put out on the seat by Cerda was reasonable. The officer then also saw a temporary driver's license among the papers, in the name of Joe Marquez Melendez; a permit to carry a concealed weapon issued to Joe M. Melendez, and a membership card for Sage's Department Store in the name of Joe Melendez. The officer took the cards, the check and the papers of identification and put them back in the wallet, which Cerda was holding in his hand, removed the wallet from Cerda and placed it in his own shirt pocket. The pocketbook also contained $100 in twenty-dollar bills, $100 in ten-dollar bills, and a $5 bill—a total of $205. Netherton testified that Cerda was informed by Sergeant Yeargan and himself that he was under arrest because of suspicion of burglary and forgery, and he was advised that he had the right to remain silent and the right to an attorney. This was after the identification of Cerda and the checking of the wallet. (*People* v. *Cockrell,* 63 Cal.2d 659, 666-667 [47 Cal. Rptr. 788, 408 P.2d 116].)

Incidentally, Joe Melendez testified at the trial of the case that his wallet had been stolen and that he did not know the people connected with Hiebert's Wheel and Brake Shop.

Detective Langfield arrived on the scene at about 9 p.m.; when he got out of his car, he went to Cerda and checked his right arm near the wrist for the tattoo, the description of which had been given to him by Mrs. Abraham and Mrs. Sinichko of Bruce's Discount House; the tattoo was there. Langfield then informed Cerda that he was under arrest for burglary and for passing a forged check. He carried on an investigation of the contents of the car, searching the driver's compartment, the passenger area and the trunk of the vehicle; when the trunk was opened, a Paymaster check protector with a green cover was discovered; it was the machine which had been stolen from The Star Automatic Transmission Company. After Langfield left the scene of the arrest, he obtained a valid search warrant entitling him to search the residences of Lopez and Cerda. In Cerda's bedroom was found the stolen check book from Hiebert's Wheel and Brake Shop.

It is not claimed by appellant that the evidence is insuffi-

cient to justify the conviction. Neither the appellant nor his partner in crime, Robert Lopez, took the stand and offered any explanation of events; the evidence of the People's witnesses and the inferences that might be drawn from their testimony stand uncontradicted. Instead, the appellant argues that he was improperly arrested, and that the search which accompanied the arrest and disclosed a damning showing against him was illegal, and that, therefore, the evidence in the case relative to the arrest should not have been received by the court. This contention is without merit.

A law enforcement officer is justified in stopping a pedestrian, or the driver of an automobile, for questioning under circumstances short of probable cause for arrest. If the investigation then reveals probable cause, the officer may arrest the suspect and conduct a reasonable search of his person and the vehicle which he is using. (See *People* v. *Mickelson*, 59 Cal.2d 448, 450 [30 Cal.Rptr. 18, 380 P.2d 658]; *People* v. *Machel*, 234 Cal.App.2d 37, 42-43 [44 Cal.Rptr. 126]; *People* v. *Rogers*, 241 Cal.App.2d 384, 387 [50 Cal.Rptr. 559]; Kolbrek and Porter, Law of Arrest, Search and Seizure, ch. XXXIII, pp. 257-280.)

When he stopped the 1957 Pontiac, Sergeant Yeargan knew that the check book from Hiebert's Wheel and Brake Shop had been stolen; that there had been an attempt to pass a Hiebert check at The Food Spot Market; that Robert Lopez was suspected by the detective division of the police department of The Food Spot Market attempt, and that his home was at 1019 East Third Street. Lopez was identified by a photograph as one of the two Mexican males who brought in the Hiebert check. A police broadcast had been made giving a description of Lopez and also a partially correct description of his automobile said to be a pinkish-colored car with a temporary license plate. Sergeant Yeargan had also gone to Bruce's Discount House where he secured a description of the man who cashed the Hiebert check there. The officer then went to Lopez's home address at 1019 East Third Street and found a salmon-colored, 1957 Pontiac parked in front. One Mexican male was sitting on the passenger side of the car and another Mexican-type man got in the driver's side of the pink automobile as he passed. When Yeargan stopped the car no license plates were visible, and the driver identified himself as Robert Lopez. While waiting help from other officers, Yeargan saw Lopez furtively drop an insurance card, bearing the name of Richard Vela, out of the car window. Certainly, there was

sufficient reason to stop the car to question Lopez and later to arrest him and to search his automobile at the place of arrest. (*People* v. *Rogers, supra,* 241 Cal.App.2d 384.) This basis for questioning and later arrest was strengthened when Lopez furtively tossed the card out the window. (See *People* v. *Webb,* 66 Cal.2d 107 [56 Cal.Rptr. 902, 424 P.2d 342]; *People* v. *Currier,* 232 Cal.App.2d 103 [42 Cal.Rptr. 562].)

When Yeargan stopped the car and found that Lopez was the driver, knowing that Lopez was a prime suspect, knowing that the defendants had used a car similar in description in their activities, it was certainly reasonable that he also detain Cerda for questioning. He knew that felonies had been committed by persons who had very probably used this particular Pontiac; he knew that more than one male was involved in the crimes. How could he have failed to detain Cerda at this stage when properly investigating the crimes as a law enforcement officer? (*People* v. *McVey,* 243 Cal.App.2d 215, 218-219 [52 Cal.Rptr. 259].)

Officer Netherton, upon his arrival at the scene, had knowledge of the burglary of Hiebert's Wheel and Brake Shop and the asportation of the 300 business checks. He had learned on the radio that two people who appeared to be of Mexican descent were cashing Hiebert checks at Bruce's and at The Miracle Market, using the false identification of Joe M. Melendez. He knew that these latter documents consisted of a temporary driver's license, a gun permit, and membership and business cards. He also had a description of a pink or salmon-colored Pontiac or Oldsmobile vehicle used by the suspects. His knowledge that there were two Mexican-appearing persons attempting to cash Hiebert checks, that one of them was Lopez, and that they were driving about in an automobile matching, at least to a significant degree, the broadcast description of the vehicle, gave him reasonable and probable cause to continue the investigation, detaining Cerda in the meantime. Ultimately, these, with additional factors, gave the police reasonable and probable cause to arrest Cerda for passing worthless checks. When Netherton asked if he had further identification, the appellant opened wide a wallet and, aided by the flashlight of the officers, looked through the papers in it. Use of the flashlight, of course, did not make this a search. (*People* v. *Gibson,* 220 Cal.App.2d 15, 23 [33 Cal. Rptr. 775].)

There was no force used, and no demand made,

according to the considered testimony of the officer, and this request was complied with by Cerda. If, in response to a reasonable official inquiry, incriminating evidence is legitimately disclosed, a defendant cannot later complain that he acted on an implied threat of unlawful conduct by the officers. (*People* v. *Perez,* 243 Cal.App.2d 528, 532 [52 Cal.Rptr. 514].)

When it was apparent to the officer that this man, companion of a known participant in several felonies, had in his pocketbook papers which had been used in connection with the felonious attempt to cash one of the checks, the net was closed, and there was confirmation of a reasonable ground to arrest Cerda. (*People* v. *Talley,* 65 Cal.2d 830, 835 [56 Cal. Rptr. 492, 423 P.2d 564].)

The arrest of Cerda was doubly justified when Detective Langfield arrived and noted that there was the tattoo of the bug or spider on his right wrist, which had been observed at the time he cashed the forged check at Bruce's Discount House. By that time, there had been two arrests for reasonable cause, that of Lopez, who was the owner and driver of the automobile, and that of his passenger Cerda. The officers were authorized to search the car as an incident of the arrests; and that search developed the fact that the check protector which had been stolen from Star Automatic Transmission was in the trunk. A search warrant to permit a search of the homes of the two defendants was secured, and the check book of Hiebert checks was found in the home of Cerda.

When Mrs. Hazel Abraham, one of the prosecution's witnesses and wife of the owner of Bruce's Discount House, finished her testimony, the court said to her: "All right, Mrs. Abraham, you may be excused. Say 'Hello' to Mr. Abraham." This was an impropriety, not consistent with a trial judge's expected demeanor in the presence of a jury, but we cannot deduce reversible error from this contretemps. An examination of Mrs. Abraham's testimony does not indicate the expression of any strong personal feeling by her or her husband against the defendants; as a witness she stated uncontradicted facts calmly and with no show of animosity. A judge's acquaintanceship with the husband of a witness, though irrelevant, could scarcely influence a jury in carrying out its sworn duty to appraise the facts and determine the guilt or innocence of the persons being tried.

The judgment is affirmed.

Stone, J., concurred.

Gargano, J., being disqualified, did not participate.

Appellant's petition for a hearing by the Supreme Court was denied October 25, 1967.