[Crim. No. 33155. Second Dist., Div. One. Mar. 7, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
NORMAN ARNO et al., Defendants and Appellants.

508

COUNSEL

Abelson, Harris & Brunon and Jonathan Bailey Lappen for Defendants and Appellants.

Burt Pines, City Attorney, George C. Eskin, Chief Assistant City Attorney, Noel R. Slipsager, Ronald R. Robinson, Richard M. Helgeson and Ward B. McConnell, Assistant City Attorneys, and Maureen R. Siegel, Deputy City Attorney, for Plaintiff and Respondent.

OPINION

THOMPSON, J.—Norman Arno and Leonard Steer were convicted in the municipal court of three counts of possessing obscene films with intent to distribute them. (Pen. Code, § 311.2.) Their convictions were reversed by the Appellate Department of the Los Angeles Superior Court because of that court's conclusion that evidence based upon a view of business premises occupied by defendants which was aided by the use of high power binoculars was illegally obtained. Because the issue of optically aided view had not at that time been directly addressed in California, we ordered the matter transferred to this court so that an opinion of statewide effect might be published.[1]

[1] We do not denigrate the opinion of the appellate department. It is exceedingly well analyzed, researched and crafted. Our sole reason for not adopting it is a minor disagreement with the manner of expressing the controlling principle.

We conclude: (1) the use of optical aids in the nature of binoculars, telescopes and the like is not itself determinative of the admissibility in evidence of the product of the observation; (2) the primary determinative factor is the presence or absence of a reasonable expectation of privacy of the person whose conduct, property, or documents is observed; (3) reasonable expectation of privacy in the context here involved is tested by the extent to which the person has exposed his conduct, property, or documents to public view by the naked eye; (4) if the purpose of the optically aided view is to permit clandestine police surveillance of that which could be seen from a more obvious vantage point without the optical aid, there is no unconstitutional intrusion; and (5) if the purpose of the optical aid is to view that which could not be seen without it, there is. We recognize that special circumstances involving a high degree of danger to life or property may permit an optically aided view and that there may be situations in which probable cause may be established to the satisfaction of a magistrate so that the aided view may be authorized by a warrant. We do not reach those latter issues on the record here.

*Facts*

Suspecting that defendants were operating a commercial venture wholesaling pornographic films, the Los Angeles police conducted a surveillance of their activities and those of their contracts over a 10-day period. Officer James D. Johnson, a member of the surveillance team, stationed himself on a hilltop 200 to 300 yards distant from the Playboy Building located at 8560 Sunset Boulevard. His vantage point was at an altitude approximating that of the sixth or seventh floor of the building. No other vantage points remotely approaching the height of the hill were located closer to the side of the building facing Johnson.

With his naked eye and also 10-power binoculars and starting with the first floor, Johnson surveyed the "whole building." Using the binoculars, he looked into various offices and a photography studio within the building over a period of five to six hours. The drapes in suite 804 on the eighth floor were open. Through the window, Johnson could see that there were people in the suite but could identify nothing other than the color of their clothing. Using the binoculars, he saw Arno and others handle a distinctively marked flip-top box displaying a label with a picture of a nude woman. The box contained eight millimeter film.

The product of Johnson's observation found its way into an affidavit signed by Officer David K. Weller which was presented to a magistrate in connection with an application for a warrant authorizing the search of suite 804, other premises, and automobiles. Later warrants were also issued. Copies of pornographic film and various business documents were seized when the warrants were executed.

Defendants' motion to suppress the product of Johnson's binocularly aided view and the evidence seized in execution of the warrant was denied. The product of the search was introduced in evidence by the prosecution. Johnson being unavailable at trial, his testimony detailing his view given at the motion to suppress was, at the prosecution's instance, read to the jury. Weller, testifying as an expert on pornography operations, gave his opinion that the premises of suite 804 in the Playboy Building were being used for the wholesale distribution of sexually explicit pornographic films. Weller based his opinion upon the seized film and documents, and upon the results of the entire investigation.

### The Optically Aided View

Some California decisions have noted but finessed the issue of the validity of optically aided views in the context of the protection of the right of privacy guaranteed by the Fourth Amendment as explicated in *Katz* v. *United States* (1967) 389 U.S. 347 [19 L.Ed.2d 576, 88 S.Ct. 507]. (See, e.g., *People* v. *Cox* (1969) 274 Cal.App.2d 816 [79 Cal.Rptr. 541]; *People* v. *Fly* (1973) 34 Cal.App.3d 665 [110 Cal.Rptr. 158].) To our knowledge, however, no California decision has addressed the issue. Neither have we found any reported California case considering the impact of article I, section 1, of the California Constitution upon the problem.

We start then with *Katz* v. *United States, supra,* 389 U.S. 347. There the United States Supreme Court held constitutionally invalid evidence obtained by FBI agents from placing an electronic amplifying and recording device outside a public telephone booth. Once and for all rejecting the "trespass test" of illegality of search or surveillance, the high court declared: "[T]he Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. [Citations.] But

what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected. [Citations.]" (389 U.S. at pp. 351-352 [19 L.Ed.2d at p. 582].)

The *Katz* court rejected a prosecution argument founded on the proposition that the phone booth was partially constructed of glass so that the defendant could be seen inside it. It said: "But what [the defendant] sought to exclude when he entered the booth was not the intruding eye—it was the uninvited ear." (*Id.*)

Given today's state of technology, it is impossible to conceptualize a legally significant difference between electronically aided aural perception and optically aided visual view. As electronic bugs and remote microphones have made it possible to intrude upon private conversation surreptitiously in an Orwellian degree, so have modern optics made possible the same sort of visual intrusion. Employment of today's technology of sophisticated optical systems, infrared process, and computer image enhancement carry the range of eyesight far beyond that of the spyglass. It can hardly be argued that the late unlamented activity of the break-in to the premises of the Democratic National Committee in the Watergate complex would have been any less intrusive had the sought after results been achieved by modern technology located outside the building.

■ The federal constitutional right against intrusion into the reasonable expectation of privacy is amplified by the specific right of privacy guaranteed by article I, section 1, of the California Constitution. The California constitutional guarantee is motivated by concern against contemporary society's accelerating encroachment upon personal freedom and security caused by increased surveillance and data collection. (*White* v. *Davis* (1975) 13 Cal.3d 757, 774-775 [120 Cal.Rptr. 94, 533 P.2d 222].) It seems virtually tailored to meet the situation here involved.

■ We thus view the test of validity of the surveillance as turning upon whether that which is perceived or heard is that which is conducted with a reasonable expectation of privacy and not upon the means used to view it or hear it. So long as that which is viewed or heard is perceptible to the naked eye or unaided ear, the person seen or heard has no reasonable expectation of privacy in what occurs. Because he has no reasonable expectation of privacy, governmental authority may use technological aids to visual or aural enhancement of whatever type available. However, the reasonable expectation of privacy extends to that

which cannot be seen by the naked eye or heard by the unaided ear. While governmental authority may use a technological device to avoid detection of its own law enforcement activity, it may not use the same device to invade the protected right.

The distinction is well elucidated in *United States* v. *Kim* (D.Hawaii 1976) 415 F.Supp. 1252. There the federal district court was faced with the admissibility of evidence of two types of optically enhanced view. FBI agents had used a high powered telescope to peer into the interior of an apartment into which no one could see without artificial aid. Other agents had used binoculars to watch a balcony into which anyone could see with the naked eye. Relying upon *Katz*, the court found that the observation into the interior of the apartment invaded a reasonable expectation of privacy but that the observation of activity on the balcony might not.

Cases cited for a contrary result do not support the proposition for which they are cited. Rather, they approve binocular or other optically aided searches under circumstances where a reasonable expectation of privacy was not established because the activity observed could be seen by others without optical aid. *Fullbright* v. *United States* (10th Cir. 1968) 392 F.2d 432 involves observation of bootlegging activity through the open door of a barn from a distance of 75 to 100 yards. (392 F.2d at p. 435.) *Commonwealth* v. *Hernley* (1970) 216 Pa.Super. 177 [263 A.2d 904, 48 A.L.R.3d 1172] is concerned with a view through an open window from a distance of about 35 feet. (263 A.2d at p. 905.) *People* v. *Superior Court (Stroud)* (1974) 37 Cal.App.3d 836 [112 Cal.Rptr. 764] validates an observation of stolen automobile parts by an officer using binoculars from a helicopter where the parts were in a back yard open for all to see. (37 Cal.App.3d at p. 839.) *People* v. *Maxwell* (1978) 78 Cal.App.3d 124 [144 Cal.Rptr. 95] involves a view through binoculars of activity on a public street. (78 Cal.App.3d at p. 128.)

■ Here the activity seen through Johnson's 10-power binoculars within suite 804 was not observable to anyone not using an optical aid. It was as much protected from the uninvited eye as was Katz's conversation from the uninvited ear. We hence conclude that the municipal court erred in denying defendants' motion to suppress the product of Johnson's observations.

*Prejudice*

■ The product of Johnson's constitutionally invalid observation found its way into the affidavit in support of a search warrant but not the fact of the manner in which the observation was made. The Johnson observation was included in the testimony received against defendants at trial. The Johnson observations were part of the basis for the expert opinion that the premises at suite 804 were being used for wholesaling pornographic film.

Conceivably the search warrant obtained based in part upon Johnson's observations would be valid if the infected evidence were excised from it. If the search warrant is valid, there is considerable evidence supporting the convictions. However, our task is to determine whether the record supports beyond a reasonable doubt the conclusion that had the jury been denied the product of the Johnson observations and the expert opinion based in part upon them, it would still have found defendants guilty. The error here is of constitutional dimension so that the strict test of harmless error is applicable. (*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].) We cannot find the error to be harmless beyond a reasonable doubt.

*Limitations on Opinion*

We do not decide whether under other circumstances, such as those involving substantial risk to life, person or property, optically aided view which intrudes upon a reasonable expectation of privacy may be constitutionally permitted. The Johnson observations by high powered binoculars are quintessential violations of the constitutional right. Faced with no risk to life, person or property, Johnson invaded the reasonable expectation of privacy not only of the defendants but of every person within the Playboy Building observable with the optical aid through a window on the side facing Johnson.

We need not decide, either, whether there are circumstances in which an optically aided view may be authorized by warrant issued by a neutral magistrate upon a showing of probable cause. We need not determine the validity of the search warrants here involved once the offending material is excised from the affidavit. That is a function appropriate for the

municipal court on retrial. Because the judgment must be reversed, we do not reach other issues raised by appellants.[2]

*Disposition*

The judgments of the municipal court are reversed.

Lillie, Acting P. J., concurred.

**HANSON, J.**—I dissent.

The majority opinion as a basis for its reversal apparently focuses on defendants' "reasonable expectation of privacy" and concludes that the trial court erred in denying the defense motion to suppress the product of Officer Johnson's binocular-aided observations of suite 804 in the commercial structure at 8560 Sunset Boulevard on the Sunset Strip known as the Playboy Building.

"A proceeding under section 1538.5 to suppress evidence is a full hearing on the issues before the [municipal] court sitting as finder of fact. [Citations.] The power to judge credibility of witnesses, resolve conflicts in testimony, weigh evidence and draw factual inferences, is vested in the trial court. On appeal all presumptions favor proper exercise of that power, and the trial court's findings—whether express or implied—must be upheld if supported by substantial evidence. [Citations.]" (*People v. Superior Court (Keithley)* (1975) 13 Cal.3d 406, 410 [118 Cal.Rptr. 617, 530 P.2d 585].)

It is clear that there is no formula for the determination of "reasonableness," and each case must be decided on its own facts and circumstances including "the degree of privacy which a defendant may reasonably expect in a given enclosure occupied by him." (*People v. Berutko* (1969) 71 Cal.2d 84, 93 [77 Cal.Rptr. 217, 453 P.2d 721].) Unless we are now in the fact finding business, I conclude there was substantial evidence, direct

---

[2]We feel compelled by the nature of the attack in the dissenting opinion to spell out a response:
1. Some answer is required to the dissent's charge.
2. Certainly we do not endorse "victimless crime."
3. How that question is involved escapes us.
4. Moreover, the constitutional issue is significant.
5. Ultimately it must be addressed in light of precedent.
6. Certainly the course of precedent is clear.
7. Knowing that, our result is compelled. (See Funk & Wagnall's The New Cassell's German Dict., p. 408, in conjunction with fn. 6 of dis. opn. of Douglas, J., in *Ginsberg* v. *New York* (1967) 390 U.S. 629, 655-656 [20 L.Ed.2d 195, 212-213, 88 S.Ct. 1274].)

and indirect, to support the trial court's express finding that defendants did not possess a "reasonable expectation of privacy" while in suite 804 under the totality of circumstances and its implied finding that Officer Johnson's use of the binoculars did not constitute unreasonable police conduct under the circumstances.

I further conclude (1) that neither the case of *Katz* v. *United States* (1967) 389 U.S. 347 [19 L.Ed.2d 576, 88 S.Ct. 507], nor the case of *White* v. *Davis* (1975) 13 Cal.3d 757 [120 Cal.Rptr. 94, 533 P.2d 222], cited in the majority opinion requires a different result; (2) that the case of *United States* v. *Kim* (D.Hawaii 1976) 415 F.Supp. 1252, is factually distinguishable; and (3) that the case of *Commonwealth* v. *Hernley* (1970) 216 Pa.Super. 177 [263 A.2d 904, 48 A.L.R.3d 1172], certiorari denied (1971) 401 U.S. 914 [27 L.Ed.2d 813, 91 S.Ct. 886], is more analogous to the case at bench and that its rationale and holdings are persuasive. Having also considered all of the other issues raised by defendants and having further concluded that they are without merit as hereinafter discussed, I would affirm the judgments of conviction.[1]

This is not a case of a "peeping Tom" police officer aimlessly surveying a "whole building" with the aid of binoculars just for kicks. Nor do I perceive this case as one taking on "Orwellian" dimensions or in any way equated to "Watergate" other than the hysteria generated by that case. A more detailed treatment of the total circumstances surrounding the use of the binoculars is warranted in order to adequately place the entire case into proper perspective. A summary of the pertinent facts included in the affidavits in support of four separate search warrants, the testimony at the

---

[1]Defendants Norman Arno and Leonard Steer were charged in a seven-count misdemeanor complaint in the municipal court with willfully, unlawfully and knowingly bringing into California obscene matter in the form of eight mm. film for distribution and exhibition in violation of Penal Code section 311.2. California's obscenity law. (The titles for the film charged in each count are as follows: count I: "Teenage Pussy #1"—"Baby Face"; count II: "H. H. #5—Raped Rectum"; count III: "H. H. #5—Raped Rectum"; count IV: "Playmate #17—Big John & The Girl Scouts"; count V: "Orgy Erotica—Alexis Livingstone—Part 2"; count VI: "Erotic Hands—Part I"; and count VII: "Erotic Hands—Part II.") Count I was dismissed following a lengthy pretrial motion.

Following a jury trial codefendant Feldstein was dismissed at the close of the People's case pursuant to Penal Code section 1118.1 and a mistrial was declared as to defendant Sinopoli. Defendants Arno and Steer were each convicted of three counts (IV, VI and VII). Defendants Arno and Steer appealed their convictions to the appellate department of the superior court which, as noted in the majority opinion, rendered an opinion (which it ordered published) reversing the judgments of conviction on the sole ground that observations of defendants by police officers made through binoculars without a search warrant violated defendants' reasonable expectation of privacy. Pursuant to California Rules of Court, rule 62(a), we ordered the cause transferred to this court for hearing and decision.

lengthy motions to suppress evidence (which were denied), and the testimony at the jury trial are substantially as follows:

## THE FACTS

On August 27, 1975, defendant Steer arrived at 6760 Selma Avenue in Hollywood, California, unlocked suites No. 1 and No. 5 and began carrying large cardboard boxes between the two offices. Upon leaving that location, he drove to 1131 Alta Loma Street, Los Angeles County.

On August 28, 1975, defendant Steer met the driver of a white van at 6760 Selma and off-loaded large cardboard boxes into office No. 1. He then took three more boxes from the trunk of his vehicle and carried them into office No. 1. When the white van left the Selma address, it went to 1138 North La Brea, Hollywood, California. This location is a film laboratory which processes hardcore and nonsexually explicit film. When the individual exited the North La Brea address, he was carrying a large cardboard box which held about 25 eight mm. film boxes which he placed inside the van. He then drove to 8560 Sunset Boulevard where he removed the box and entered the building going to the eighth floor.

On September 2, 1975, defendant Steer was seen leaving 8560 Sunset and was followed directly to the Selma location. Once there he unlocked offices No. 1 and No. 5. Later on that same day he loaded four large cartons from office No. 1 into the back of a station wagon which then went to the Drake Adult Theatre at 7566 Melrose, Hollywood, California. In one of the cartons Officer David Weller saw an eight mm. film box with the title "Hard Core Girls." The station wagon then proceeded to the Ventura Adult Theatre located on Vanowen Street in North Hollywood where three cartons were taken from the station wagon into the theatre. Two eight mm. films delivered in one of the cartons, "Hard Core Girls, Adults Only" and "HH5, Raped Rectum," were purchased by police the next day.

On September 4, 1975, defendants Arno and Sinopoli who were known to police officers as distributors of pornographic films were seen at 6760 Selma Avenue. They left that location in Arno's Cadillac (license No. 862 LRJ) driven by defendant Arno and went to the Playboy Building, a commercial structure, at 8560 Sunset Boulevard on the "Sunset Strip." The car was leased by defendant Arno under the name Stacey Distributors, 1131 Alta Loma.

Officer James D. Johnson who was assisting Officer David K. Weller in his surveillance of Sinopoli and Arno followed the defendants in a separate vehicle and took up an observation point across the street and north of the building on a hill approximately level with the 6th or 7th floor of that structure, approximately 200-250 yards away.[2] He watched the parking lot next to the building on the west side and the front of the building and checked each of the floors until, on the eighth floor, he saw defendants Sinopoli and Arno. Officer Johnson was able to identify Arno and Sinopoli without the aid of binoculars and could see them moving about in front of large glass windows and could identify the color of their clothing. Since he was unable to make out their facial features, he used binoculars to verify his unaided identification of the individuals he previously had observed driving from the Selma location to the 8560 Sunset address and in the parking lot west of that location. With the aid of wide angle binoculars (10 by 50) he could see their features and into the offices and beyond the point where they were standing, next to the window, and observed phone calls being made, film being handled, and a check. He saw defendant Arno open a flip top eight millimeter box with a nude woman on the cover which appeared similar to the one he had previously seen at the Ventura Theatre.

Officer Johnson watched the defendants from 11 in the morning until 5 in the afternoon, during which time the drapes on the windows were open. Officer Johnson advised Officer Weller via police car radio that defendants Arno and Sinopoli were present in offices located at the last two windows in the northeast corner of the building. From conversations with Officer Johnson over police radio, Officer Weller was able to determine from Johnson's observations and his own on the eighth floor that defendants Arno and Sinopoli were in suite 804. The door to suite 804 bore the legend "Stacey, Inc."

On September 5, 1975, defendants Arno and Sinopoli were seen at the Selma location removing boxes from office No. 1 and placing them in office No. 5 and removing boxes from office No. 5 and placing them in office No. 1. Defendant Arno also removed some boxes from his Cadillac, license No. 862 LRJ, and placed them into office No. 1.

---

[2] Officer Johnson stated he may have been much closer. He may have been as close as 200 to 250 feet (about 85 paces on a direct line) rather than 200 to 250 yards.

He testified "[t]he street is 50 feet wide. There is another 50 feet to 100 feet for that restaurant. Another 50 to 100 feet up the bank. But as you're going, it might be a lot shorter."

Based on the foregoing facts, Officer Weller wrote search warrant No. 11869 during the evening of September 5, 1975, and it was signed by Judge Eric Younger just after midnight. He served the warrant at the various locations and vehicles between 1 a.m. and 3 a.m. Pursuant to the warrant, three copies of "HH5—Raped Rectum" were seized from office No. 1 at 6760 Selma; photos were taken of the interior of office No. 1 at 6760 Selma; and police officers observed numerous eight mm. film boxes in plain sight whose covers had photographs depicting acts of intercourse, oral copulation and sodomy. In office No. 5 there were 35-50 pasteboard containers with numerous gum labels with sexually explicit photographs used to completely cover individual boxes of eight mm. film. One of the containers for gummed labels contained the notation "PM-17" which stands for "Playmate #17—Big John Holmes and the Girl Scouts" (count IV).

After searching 6760 Selma, Officer Weller went to 1131 Alta Loma, apartment 217, and informed defendant Arno of the search warrant for 8560 Sunset and the Cadillac, license No. 862 LRJ. Defendant Arno unlocked his vehicle. Thereafter, Officer Weller asked defendant Arno if he would come to 8560 Sunset Boulevard with the keys to suite 804 and he agreed to do so. After waiting an hour and a half for defendant Arno and being unable to locate him, the police forcibly entered the location. Once inside suite 804, numerous documents were seized, a number of which were admitted into evidence. Among those admitted was a form letter inside an envelope bearing the letterhead "Stacey Film Distributors." Tucked inside the envelope with the letter were 3 eight mm. film box covers for "HH5—Raped Rectum." It was stipulated that the letter was signed by defendant Sinopoli. Based on the documents found in suite 804, the films found at 6760 Selma Avenue, and the conduct of the individuals under surveillance between August 26, 1975, and September 5, 1975, Officer Weller formed the opinion that the Selma and Sunset locations were being used for the purpose of wholesaling sexually explicit films to retailers, other wholesalers and mail order outfits. Further, that only sexually graphic eight mm. films were being distributed. The defense stipulated that Officer Weller was an expert in distribution, sale and availability of pornography.

In October 1975 Officer Robert Peters learned from Gene McKay, airfreight supervisor for United Airlines, that pornographic films could be seen through a tear in the corner of one of a group of six cartons waiting to be picked up. A telephone number on each of the cartons, 659-6257, belonged to Norman Arno of 1131 Alta Loma, apartment 217, and was in

use under that subscriber's name in October 1975. An individual driving a station wagon picked up the six cartons and was observed to arrive at 1131 Alta Loma Drive. Shortly thereafter codefendant Steer left that location driving Cadillac license No. 862 LRJ (defendant Arno's car) to 942-946 Seward in Hollywood. Codefendant Steer took the six cartons first observed at the United Airlines terminal out of the trunk of the Cadillac and placed them into vault No. 209. Based on these observations, Officer Peters prepared search warrant No. 11990 for 942-946 Seward, vault No. 209 and conducted a search pursuant to that warrant on October 16, 1975. Inside the vault, Officer Peters found the six cartons observed at the airport and in the Cadillac including the one with the tear. Based on observations of eight mm. film boxes with photo covers which were in plain sight in vault No. 209, supplemental search warrant No. 11991 was prepared, submitted to a magistrate, issued and executed. Pursuant to that warrant copies of "Raped Rectum," "Big John Holmes and the Girl Scouts," and "Erotic Hands—Parts I and II," among others, were seized. Based on his training and expertise, Officer Peters testified that in his opinion the nature of the business at 942-946 Seward was the commercial distribution of pornographic eight mm. films on a wholesale level.

DISCUSSION

THE USE OF BINOCULARS.

The majority opinion relies primarily on *Katz* v. *United States, supra,* 389 U.S. 347 (involving electronic eavesdropping of an individual placing a telephone call from a public telephone booth), *White* v. *Davis, supra,* 13 Cal.3d 757 (involving police posing as students in an academic setting), and *United States* v. *Kim, supra,* 415 F.Supp. 1252 (involving the warrantless use of a telescope by FBI agents to view the interior of defendant's apartment from a quarter of a mile away), as the basis for concluding that the use of the binoculars by Officer Johnson constituted an invasion of defendants' constitutionally protected "reasonable expectation of privacy."

As previously stated, in my opinion neither *Katz* nor *White* requires us to reverse and *Kim* is factually distinguishable.[3]

---

[3]In *Kim* FBI agents used an 800 millimeter telescope with a 60 millimeter opening to observe suspected gambling activities in defendant Kim's apartment and on his balcony from a quarter of a mile away. The use of the telescope enabled the agents to see other defendants in the apartment making telephone calls and reading a sports journal. From a different vantage point approximately 160 feet from the building a different group of FBI

The *White* case is in no way "virtually tailored to meet the situation here involved" as stated in the majority opinion. *White* stemmed from a taxpayer's suit against the city's chief of police seeking to enjoin the alleged illegal expenditure of public funds in connection with certain covert intelligence activities. The Supreme Court reversed the trial court's order sustaining a general demurrer without leave to amend and entered judgment for defendant. The Supreme Court held that police covert operations posing as students, enrolling in classes and recording sessions of university classes and in public and private meetings of university-sponsored organizations prima facie violates freedom of speech, freedom of assembly and the state constitutional right of privacy (Cal. Const., art. I, § 1).

The *White* case is so clearly inapplicable that it does not warrant further discussion except to point out that in the instant case Officer Johnson was not surveilling students and professors engaged in legitimate educational pursuits at state-financed educational institutions cloaked with freedoms of speech, assembly and academic pursuit. In his official capacity he was surveilling specific defendants reasonably suspected of conducting a large scale illegal business of distribution of sexually explicit pornography in violation of Penal Code section 311.2. Moreover, article I, section 1 of our state Constitution (1972 amendment), was primarily directed at "Government agencies [and businesses] [who] seem to be competing to compile the most extensive sets of dossiers of American citizens." The court said: "Computerization of records makes it possible to create 'cradle-to-grave' profiles of every American. . . . It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us." (*White* v. *Davis, supra,* 13 Cal.3d 757, 774.) Obviously, the purpose of article I, section 1, was not intended to nor did it restrict in any way reasonable police conduct while surveilling specific individuals reason-

---

agents used a pair of binoculars (7 by 35) to view the terrace. The information acquired during the surveillance was used to establish probable cause for a court-approved wiretap and to demonstrate that the wiretap was necessary since the surveillance and other investigative procedures could not produce enough evidence to convict the suspected gamblers.

The *Kim* Court granted defendant's motion to suppress evidence derived from telescopic surveillance of Kim's apartment building since the use of the telescope to observe activities within the apartment was an intrusion of privacy which constituted a "search" and if the FBI agents had probable cause to suspect criminal activity and needed telescopic surveillance they should have applied for a search warrant.

ably suspected of on-going criminal activity nor did it under the circumstances of the instant case intend to clothe defendants herein with a "privileged" as distinguished from a "reasonable" expectation of privacy.

In my view the factual circumstances in the case of *Commonwealth* v. *Hernley, supra,* 216 Pa.Super. 177, are closely analogous to the instant case and its rationale and reasoning are persuasive. I further note that in *Hernley* certiorari was denied by the United States Supreme Court (401 U.S. 914 [27 L.Ed.2d 813, 91 S.Ct. 886]).

In *Hernley* an FBI agent suspected defendant Hernley of printing football gambling forms in his print shop. The agent noticed that the presses inside the print shop were being operated in the evening hours but he was unable to see what was being printed from his position off the premises due to the location and size of the windows. In order to remedy this problem the agent mounted a four foot ladder which he placed on the railroad tracks abutting defendant's property and from a distance of 30 to 35 feet observed through the side window with the aid of binoculars some "Las Vegas" football parlay sheets being run off the press.

The trial court suppressed all evidence obtained under a search warrant on the basis that the search was unreasonable based on *Katz* v. *United States, supra,* 389 U.S. 347. The *Hernley* reviewing court reversed the trial court's ruling suppressing the evidence. I quote at length from pages 906-907 [263 A.2d 904]:

"Whether the actions of the FBI agent in this case constitute an unreasonable search can only be decided by examining all the surrounding circumstances in light of the Fourth Amendment requirements as interpreted by the relevant case law. See Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963). This examination amounts to a balancing of interests between the security of public order by the solution and prevention of crimes, and a person's immunity from police interference into his privacy.' Commonwealth v. Hicks, 209 Pa.Super. 1, 5, 223 A2d 873, 875 (1966). In making this determination, it is essential to keep in mind the basic purpose of the Fourth Amendment to protect the individual's privacy against arbitrary intrusion by the police. Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886); Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949); Camara v. Municipal Ct., 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).

"Viewing the facts of this case, we cannot agree with the court below. A long line of federal court decisions involving window observations have held such to be in violation of the Fourth Amendment where the officers made their surveillance while on the defendant's property. See Brock v. United States, 223 F.2d 681 (5th Cir. 1955); People of State of Cal. v. Hurst, 325 F.2d 891 (9th Cir. 1963), rev'd on other grounds, 381 U.S. 760, 85 S.Ct. 1796, 14 L.Ed.2d 713 (1965); and State of Texas v. Gonzales, 388 F.2d 145 (5th Cir. 1968). [Fn. omitted.] In contrast, cases such as People v. Wright, 41 Ill.2d 170, 242 N.E.2d 180 (1968), and Ponce v. Craven, 409 F.2d 621 (9th Cir. 1969), have upheld visual observations where the police, as here, were off the defendant's premises.[4] Further, the fact that the visual observation was made by the use of binoculars has not made it unreasonable. In Johnson v. State, 2 Md.App. 300, 234 A.2d 464 (1967), the court upheld an observation by police officers into the windows of defendant's house by using binoculars while situated in an adjacent house. In Fullbright v. United States, 392 F.2d 432 (10th Cir. 1968), cert. denied, 393 U.S. 830, 89 S.Ct. 97, 21 L.Ed.2d 101 (1968), where the federal agents observed defendants through an open door, the court held that the use of binoculars did not change the admissibility of the information gained. The Supreme Court of the United States, in applying the plain view doctrine when a searchlight had been used in apprehending a rum runner, opined, 'Such use of a searchlight is comparable to the use of a marine glass or field glass. It is not prohibited by the constitution.' United States v. Lee, 274 U.S. 559, 563, 47 S.Ct. 746, 748, 71 L.Ed. 1202 (1927).

"The question then is whether the decision in *Katz* requires a different result. There the court held that the attachment of an electronic listening device to the outside of a telephone booth, whereby the police were able to record the defendant's conversation while using the telephone within the booth, was an unreasonable search and seizure because it violated the privacy upon which defendant justifiably relied while using the telephone booth. Previous cases holding that electronic surveillance was not unreasonable where no trespass was involved were held to be no longer controlling.

---

[4] In a footnote at this point the court states: "Apart from the trespass idea, these rely on the 'plain view' doctrine. The basis of this theory was recently expressed in Harris v. United States, 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067 (1968), as follows: 'It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence.' "

"We find that *Katz* does not require a different result for two reasons. . . . The second, but more significant, reason is that although *Katz* does eliminate the physical intrusion requirement in electronic eavesdropping situations, it also emphasizes the need for a justifiable expectation on the part of the suspect that he is conducting his activity outside the sphere of possible governmental intrusion. Justice HARLAN's concurring opinion points to a two-fold requirement: That (a) the suspect has 'exhibited an actual (subjective) expectation of privacy,' and (b) that society can view this expectation as a reasonable one. 389 U.S. at 361, 88 S.Ct. at 516. In *Katz,* the suspect entered a phone booth, closed the door and paid the toll, thereby seeking to effectively exclude the listening ear. The Court held that his expectation in this regard was justifiable. Our case presents the situation in which it was incumbent on the suspect to preserve his privacy from visual observation.[5] To do that the appellees had only to curtain the windows. Absent such obvious action we cannot find that their expectation of privacy was justifiable or reasonable. The law will not shield criminal activity from visual observation when the actor shows such little regard for his privacy."

In *Hernley* as in the case at bench the officer's optically aided view was into an enclosure in a commercial structure used for business purposes (unlike *Kim* where the enclosure was Kim's apartment [a man's home is his castle]). The optics used in both *Hernley* and the instant case were binoculars employed from a relatively close range while in *Kim* a telescope was used from a distance of a quarter of a mile. Officer Johnson unaided by binoculars could see individuals (defendants Arno and Sinopoli) in suite 804 moving around in front of the window who had the same color of clothing on as did the individuals who had left the Selma location unlike *Kim* where "plain view of Kim's apartment was impossible; only an aided view could penetrate." (*United States* v. *Kim, supra,* 415 F.Supp. 1252, 1256.) The other specific activities Officer Johnson observed and reported merely were made clear within the view while verifying that it was in fact defendants Arno and Sinopoli who were in suite 804. Moreover, the reasonableness of Officer Johnson's conduct in the instant case is stronger than that in *Hernley.* In *Hernley* the FBI agent had to obtain a ladder and climb it in order to obtain a line of vision into the print shop aided by binoculars. Here, Officer Johnson's surveillance

[5] In a footnote at this point the court states: "The court below noted that the Supreme Court in *Katz* found no support for the government in the fact that the suspect was visible through the glass-constructed booth. That finding, however, is not applicable here because in *Katz* it was the 'uninvited ear' which was sought to be excluded rather than the 'intruding eye.' "

was conducted from a natural hill mass adjacent to and about level with suite 804 of the Playboy Building.

I conclude that the totality of circumstances described above amply supports the trial court's denial of defendants' motion to suppress and that, as in *Hernley*, it was incumbent on them to preserve their privacy from visual observation by merely drawing the drapes. Absent such an obvious and simple action I cannot find their expectation of privacy either justifiable or reasonable. The law should not shield their criminal activity from visual observation when they have shown such flippant disregard for their own privacy while knowingly conducting their criminal activity.

Nor do I perceive that defendants in the instant case possessed any greater expectation of privacy under the circumstances present here than did defendant Stroud in *People* v. *Superior Court (Stroud)* (1974) 37 Cal.App.3d 836 [112 Cal.Rptr. 764], petition for hearing denied May 8, 1974. In *Stroud* the reviewing court held that a view from a circling police helicopter at an altitude of about 500 feet with the "naked eye and through 20-power gyrostabilized binoculars" into a private yard did not constitute impermissible police conduct.

Nor do I perceive any functional difference between the use of ordinary binoculars to aid the naked eye under the circumstances present here than the use of a flashlight beamed inside a dimly lit apartment through a door voluntarily opened (*People* v. *Boone* (1969) 2 Cal.App.3d 66 [82 Cal.Rptr. 398]) or beamed through the cracks in a garage wall to ascertain from the adjoining garage if defendant had stolen goods in his garage (*People* v. *Lees* (1967) 257 Cal.App.2d 363 [64 Cal.Rptr. 888]) or beamed inside a vehicle from outside the vehicle (*People* v. *McVey* (1966) 243 Cal.App.2d 215 [52 Cal.Rptr. 269]), all of which has been held not to constitute an illegal search.

Moreover, assuming, arguendo, that the use of the binoculars constituted impermissible police invasion of defendants' "reasonable expectation of privacy," I conclude that if the information so obtained was excised from the affidavit in support of the warrant to search suite 804 the affidavit was still sufficient to establish probable cause to authorize issuance of the warrant. Noting further (1) that defendant Arno was the only convicted defendant present in suite 804 (not convicted defendant Steer) when Officer Johnson used the binoculars to improve his ability to see more clearly what he had already seen in some detail with his naked

eye; (2) that none of the evidence seized from suite 804 pursuant to the search warrant (No. 11869) was the basis of the counts of which they were convicted; and (3) that the defendants' other assignments of error as hereinafter discussed lack merit, I further conclude that even if the testimony pertaining to the binocular-aided view was erroneously admitted into evidence at the time of trial the error was harmless beyond a reasonable doubt (*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]), the prosecution having woven such a strong web of guilt absent such testimony.

THE OTHER ISSUES.

The majority opinion does not address the other issues raised by defendants on appeal. The opinion of the appellate department of the superior court simply states they were considered and found to be without merit. I also have considered them and conclude they all lack merit and briefly dispose of them as follows:

I

The police obtained information from the Pacific Telephone Company that the subscriber of the unlisted telephone number (659-6257) seen in plain view on the six cartons of pornographic films at the United Airlines air freight terminal on October 14, 1975, was defendant Arno at 1131 Alta Loma Road, apartment 217. The acquisition of the information by the police from the telephone company which was *solely for identification purposes* did not constitute impermissible police conduct (see *People* v. *Elder* (1976) 63 Cal.App.3d 731, 737-738 [134 Cal.Rptr. 212]) contrary to defendants' contention.

II

Defendants' contention that search warrant No. 11869 was invalid because the nighttime service authority was not supported by a showing of good cause is not supported by the record.

Penal Code section 1533 provides in pertinent part that a magistrate "upon a showing of good cause, . . . may, in his discretion, insert a direction in a search warrant that it may be served at any time of the day or night . . . ." To establish good cause "[t]he magistrate must be informed of facts from which it reasonably may be concluded that the contraband to be seized will not be in the place to be searched during the

hours of 7 a.m. to 10 p.m." (*People* v. *Watson* (1977) 75 Cal.App.3d 592, 598 [142 Cal.Rptr. 245].) "[S]ection 1533 does not require a separate statement as to good cause for the serving of a warrant in the nighttime (*People* v. *Walker,* 250 Cal.App.2d 214, 219 [58 Cal.Rptr. 495]): if the affidavit, read in a common sense manner and as a whole reasonably supports the inference that the interests of justice are best served by the authorization of nighttime service, provision for such service in the warrant is proper. (Cf. *People* v. *Scoma, supra,* 71 Cal.2d 332, 340 [78 Cal.Rptr. 491, 455 P.2d 419].) Absent an abuse of discretion, the magistrate's finding of a reasonable necessity of nighttime service will not be disturbed on appeal. (*Solis* v. *Superior Court,* 63 Cal.2d 774, 776-777 [48 Cal.Rptr. 169, 408 P.2d 945]; *People* v. *Walker, supra,* 250 Cal.App.2d 214, 219-220 [58 Cal.Rptr. 495].)" (*People* v. *Mardian* (1975) 47 Cal.App.3d 16, 35 [121 Cal.Rptr. 269].)

Here, a common sense reading of the entire warrant, together with the reasonable inferences to be drawn therefrom, leads me to conclude that Judge Younger was justified in finding that good cause was present to authorize nighttime service and there was no abuse of discretion.

During the daylight hours on September 5, 1975, defendants Arno and Sinopoli began activities indicating a movement of inventory. In light of Officer Weller's general knowledge of the field of obscenity and the specific observations made during the previous 10 days of surveillance, he concluded that there might be concealment, destruction or removal of evidence before a search warrant could be drafted and immediately undertook to prevent that from occurring. He made a separate statement of facts regarding the necessity of nighttime service which along with the search warrant (No. 11869) were written and typed on the same evening (Sept. 5, 1975) between the hours of 4 p.m. and 12 midnight. It could reasonably be concluded from the entire warrant including the separate affidavit requesting nighttime service that Judge Younger made the determination that: (1) the films were still on the premises and/or vehicles to be searched; and (2) the films and other evidence may have been in the process of being removed or concealed, prepared for removal or concealment or likely to be destroyed prior to the opportunity to seize them pursuant to a warrant operable only on the following day.

## III

Defendants also contend that the opening of film boxes which have photograph covers in plain sight depicting acts of oral copulation and

sodomy for the purpose of screening the film in order to provide a description of its contents to a reviewing magistrate to support the issuance of a supplementary warrant constitutes an illegal search. Their reliance on *Fixler* v. *Superior Court* (1974) 38 Cal.App.3d 475 [113 Cal.Rptr. 285], is misplaced.

Here, search warrant No. 11990 authorized the seizure of copies of 1 film from vault No. 209 at 942-946 North Seward Avenue. When Officer Peters entered vault No. 209, pursuant to the search warrant, he saw the six large cartons first seen at the United Airlines air freight terminal which were unloaded from the trunk of defendant Arno's Cadillac by codefendant Steer and taken into vault No. 209. As Officer Peters walked toward the six cartons he observed large numbers of boxes of eight mm. film sitting in plain sight on shelves and a table on the south wall of the vault. The covers of many of the boxes clearly visible to him were photographs depicting acts of oral copulation and sodomy. From his training and experience Officer Peters knew that sexually explicit eight millimeter film is packaged in boxes utilizing a photograph on the cover of a scene or excerpt taken from the movie within the box. Among the 47 boxes of eight mm. film with covers in plain sight were "Playmate #17—Big John Holmes and the Girl Scouts," "Erotic Hands, I," and "Erotic Hands, II" which were the basis for counts IV, VI and VII, respectively. These three films and thirteen others had been previously viewed in their entirety by Officer Peters who recalled that they contained acts of oral copulation, masturbation and sexual intercourse. During those previous viewings Officer Peters recalled that the boxes used to hold the films bore the same photographs and titles as did the boxes he saw in vault No. 209. Officer Peters and fellow investigators viewed the 47 films at the location and wrote the descriptions of them which they included in their affidavit for supplemental search warrant No. 11991.

In *Fixler* the officers were executing a warrant authorizing the seizure of two specific sex magazines. At the warehouse, they found, in addition to the 2 named magazines, 171 other magazines which they *seized without a warrant*. The 171 unnamed magazines were suppressed because of the lack of a valid warrant.

Here, on the other hand, Officer Peters and his fellow investigators acted commendably and entirely properly to avoid any *Fixler* error. They did not seize the other films, they merely viewed them and then applied for a warrant to seize the films. The fact that the officers could not seize the films without a warrant does not mean that they could not relate their

observations as the basis for securing warrant No. 11991. In fact, if the officers had ignored the films in plain sight in vault No. 209 which were not covered by warrant No. 11990 and had not proceeded as they did they would have been guilty of gross dereliction of their duties as police officers.

IV

Defendants herein additionally assert that individuals who were totally nonambulatory and confined to wheelchairs were systematically excluded from jury duty which violated their (defendants') rights to due process under the Sixth Amendment since the jury panel did not represent a cross section of the community. They (defendants) argue that such persons confined to wheelchairs constitute a cognizable group and attempted to prove by expert testimony that such nonambulatory persons faced unique attitude and architecture barriers and possessed unique attitudes and viewpoints concerning sexual conduct and sexually graphic films.

The question of the existence of a cognizable group is a question of fact and automatic exclusion of an "identifiable group" does not in and of itself establish those persons as a cognizable group. (*Hernandez* v. *Texas* (1954) 347 U.S. 475, 478 [98 L.Ed. 866, 870, 74 S.Ct. 667].) In *United States* v. *Guzman* (S.D.N.Y. 1972) 337 F.Supp. 140, the court defined cognizable groups at pages 143-144 as follows: "A group to be 'cognizable' for present purposes must have a definite composition. That is, there must be some factor which defines and limits the group. A cognizable group is *not* one whose membership shifts from day to day or whose members can be arbitrarily selected. Secondly, the group must have cohesion. There must be a common thread which runs through the group, a basic similarity in attitudes or ideas or experience which is present in members of the group and which cannot be adequately represented if the group is excluded from the jury selection process. Finally, there must be a possibility that exclusion of the group will result in partiality or bias on the part of juries hearing cases in which group members are involved. That is, the group must have a community of interest which cannot be adequately protected by the rest of the populace. See United States v. Greenberg [(S.D.N.Y. 1961)] 200 F.Supp. [382] at 391." (Italics added; see also *Adams* v. *Superior Court* (1974) 12 Cal.3d 55 [115 Cal.Rptr. 247, 524 P.2d 375].)

I conclude that the evidence in the case at bench amply supports the court's findings below (Hon. Vaino Spencer presiding), following a

two-day hearing on defendants' motion to quash the jury panel, that persons unable to extricate themselves from wheelchairs without the assistance of another person are not a cognizable group within the definition of *United States* v. *Guzman, supra,* 337 F.Supp. 140, and the purported unique views held by such individuals were in fact not unique to them alone but present in a larger percentage of the population.

In the instant case Jury Commissioner Holtzendorff testified that persons confined to wheelchairs at all times were not called for jury duty regardless of whether they wished to serve or not. The policy of exclusion did not extend to persons who used wheelchairs part-time or in addition to canes, braces and other similar devices. It was not the policy that wheelchair confined persons were decrepit or devoid of ordinary intelligence. The policy was based upon section 198, subdivision (2), of the Code of Civil Procedure which requires that a juror be in possession of his natural faculties. The justification for the exclusion included: (1) the physical hazard to all individuals in a multistory building during a mass evacuation requiring the use of stairs; (2) the lack, in some trial court buildings, of ramps and special restroom facilities; (3) the lack in some buildings of assigned parking spaces for handicapped persons; (4) the lack of specially equipped vehicles to transport wheelchair confined jurors to all locations which might be required during jury service; and (5) the physical hazard to the wheelchair confined individual during a multistory building mass evacuation.[6]

There was evidence adduced at the hearing on defendants' motion to quash the jury panel to show that persons confined to wheelchairs generally suffer more anxiety, depression and frustration by reason of attitudinal, architectural and sexual barriers (which in some cases by reason of impotency and loss of genital sensation results in sexual fantasies and the enjoyment of erotic literature being more acceptable) than the general population taken as a whole. However, there was also

---

[6]The record on appeal contains a letter dated March 20, 1978, from Jury Commissioner William A. Goodwin, addressed to Judge John L. Cole, presiding judge of the appellate department, which states in substance that while prior to January 1, 1977, the policy of excluding wheelchair-bound citizens from jury service did exist for the reasons testified to by Jury Commissioner Holtzendorff (lack of appropriate physical facilities and for their physical safety) that since that date (Jan. 1, 1977) "no wheelchair-bound citizen has been excluded from jury service unless he or she requested it, solely for the reason of being confined to a wheelchair." Commissioner Goodwin in his letter pointed out that there has been an "extensive survey of all Court facilities" and an on-going "upgrading of facilities where needed to ensure that wheelchair-bound citizens" can safely provide jury service. He pointed out that "Since January 1, 1977, [only] three wheelchair-bound citizens have provided jury service."

evidence (1) that when wheelchair persons became ambulatory they retained a good comprehension and understanding of the barriers as experienced by those so confined for life as do the spouses, friends and parents of such persons; and (2) that anyone in society could become wheelchair confined for a year or life at any time and thus the membership of the group shifts from day to day and its members are arbitrarily selected without regard to wealth, intelligence, age, race, religion and background.

Thus, the evidence shows that the membership in a group of totally nonambulatory persons confined to wheelchairs shifts from day to day and is arbitrarily selected. Moreover, it shows that the so-called "common thread" in respect to the alleged acceptability of erotic literature by such persons is also represented by those former nonambulatory persons who became ambulatory and the spouses, friends and parents of the permanently wheelchair-confined persons. Finally, it is obvious that the so-called "uniqueness" of the purported propensity of persons confined permanently to wheelchairs to find erotic materials acceptable is not "unique" at all or the theaters showing such films would not have filled their establishments with row on row of fixed seats. It is also obvious that the purveyors of sexually explicit materials would not be able to stay in business if they had to rely solely on those unfortunates bound to wheelchairs as their customers.

Finally, I summarily reject defendants' assertion that the systematic exclusion of wheelchair-confined persons from jury duty is a denial of equal protection of the law. The defendants themselves do not fall within the group confined to wheelchairs and do not have the standing to raise this issue except as it relates to their right to a cross-section jury as hereinbefore discussed[7] (but in any event see *Adams* v. *Superior Court* (1974) 12 Cal.3d 55, 61 [115 Cal.Rptr. 247, 524 P.2d 375]; fn. 6, *ante,* p. 529).

### V

Defendant Arno's contention that his convictions should be reversed because he was denied his constitutional right to be personally present during the course of his trial is not supported by the record.

---

[7]One would have to be unobservant and highly insensitive not to be extremely indignant at defendants who are engaged in a large scale hardcore pornographic film distribution business and who themselves are not wheelchair-confined to attempt to use those who are so unfortunately restricted as scapegoats in a far-fetched legalistic ploy to escape their own criminal liability.

It is clear that the right to be personally present during trial may be waived pursuant to Penal Code section 977, subdivision (a), after a finding of voluntary absence pursuant to Penal Code section 1043 which was designed to prevent a defendant from intentionally frustrating the orderly process of his trial by voluntarily absenting himself. (See *People* v. *Connolly* (1973) 36 Cal.App.3d 379, 384-385 [111 Cal.Rptr. 409].)

Here, the record shows that the trial court did not abuse its discretion when it made the determination that defendant Arno had voluntarily absented himself and proceeded with trial as provided for by Penal Code section 1043. The record reflects that defendant Arno consented to the hearing of pretrial motions in his absence. The court, based on a letter from his doctor (Keith Agre) which outlined Arno's medical problems stating that his condition would improve over the next two to three months, continued the case for approximately two months after admonishing Arno to consult with his attorney in preparation for trial in the event he should choose to remain home subsequent to the date of trial. When the case came to trial on December 7, 1976, the court was informed through counsel without proof or documentation that defendant Arno was to be hospitalized for tests but no request for another continuance was made nor was an express objection lodged to going forward with trial in defendant Arno's absence. The trial court based on the above facts and its own observations of defendant Arno in September found that defendant Arno had voluntarily absented himself from trial. Moreover, defendant Arno appeared in court on December 17, 1976, to testify out of the presence of the jury during which testimony he mentioned that he had been released from the hospital and had returned home Saturday, December 11, 1976. Following the conclusion of his testimony, he was excused after being introduced to the jury.

The total circumstances surrounding Arno's absence indicate that he was capable of attendance at his convenience or when it suited his purposes. Furthermore, it is clear from the record, including his doctor's letters, that defendant Arno's condition was neither going to improve nor worsen and that at no time in the future would it have necessarily been more convenient to proceed. To allow defendant to have indefinitely put off his trial under those circumstances would have frustrated the lawful purpose of Penal Code section 1043 and would have effectively impeded the orderly processes of the judicial system.

In addition, it appears that the failure of Arno's counsel to pursue pretrial relief by way of a petition for a writ of mandate/prohibition after the court's decision to proceed with trial may have constituted an implied waiver of his client's right to be present. (See *People* v. *Wilson* (1963) 60 Cal.2d 139, 149 [32 Cal.Rptr. 44, 383 P.2d 452] [objection waived by failure to seek extraordinary writ].)

## VI

The trial court did not commit prejudicial error, as claimed by defendants, by refusing to strike the expert testimony of Officer Weller which was partially based on hearsay documents.

It is well established that police officers have been recognized as expert witnesses in a multiplicity of fields dealing with law enforcement. (*People* v. *Hardy* (1969) 271 Cal.App.2d 322 [76 Cal.Rptr. 557]; *People* v. *Parks* (1968) 263 Cal.App.2d 490 [69 Cal.Rptr. 368]; *People* v. *Cruz* (1968) 260 Cal.App.2d 55, 59 [66 Cal.Rptr. 772]; *Hart* v. *Wielt* (1970) 4 Cal.App.3d 224 [84 Cal.Rptr. 220].) The parties stipulated that Officer Weller was a duly trained, qualified and experienced investigator in the area of pornography; that he was an expert in the distribution and sale, at all levels, of pornographic matter; and that he had expertise and knowledge concerning the availability of pornography and the nature of its commercial distribution.

Here, Officer Weller testified as an expert witness that it was his opinion that the 6760 Selma and 8560 Sunset Boulevard locations utilized by defendants were sites of wholesale distribution of sexually explicit films to retailers, wholesalers and mail order establishments. His opinion was partially based upon certain documents which were seized at the two locations consisting of accounting sheets of film transactions and order forms for film. The court later refused admission of the documents which formed a partial basis for his opinion into evidence on the ground that they constituted hearsay and a foundation for the business record exception could not be laid. However, the court denied defendants' motion to strike all testimony concerning the documents supporting Officer Weller's opinion with respect to commercial distribution.

An expert may state the reasons for his opinion and the matter upon which it is based. (Evid. Code, § 802.) The fact that the documents involved in the instant case were later declared to be inadmissible hearsay does not affect the propriety of reference to and utilization of them in the

formation of expert opinion. Evidence Code section 801, subdivision (b), authorizes the use of hearsay or other inadmissible matter as a basis for an expert's opinion (see *People* v. *Beach* (1968) 263 Cal.App.2d 476, 487 [69 Cal.Rptr. 394]) provided it satisfies the condition of being the type of matter upon which an expert may reasonably rely in forming his opinion by having some indicia of trustworthiness and reliability in order to serve as the basis for the expert opinion. (See Jefferson, Cal. Evidence Benchbook, § 29.4, pp. 507-508.) Here, the type of records at issue, invoices, orders and accounting sheets, are documentary in nature and possess clear indicia of reliability in terms of being the type of data upon which Officer Weller could reasonably rely in reaching his opinion.

Assuming, arguendo, that Officer Weller's opinion was inappropriately based in any part on inadmissible hearsay, the remaining observations and documents declared admissible, standing alone, would have served to support his conclusion. There was ample competent corroborated evidence before the jury from which they could draw the same conclusion that Officer Weller drew absent any knowledge of the documents in question. Moreover, defendants can show no prejudice as a result of the admission of Officer Weller's expert testimony in that the documents referred to and complained of by defendants related to a film which served as the basis for a count which was ultimately dismissed. (Cal. Const., art. VI, § 13.)

## VII

Defendants' contention that the evidence was insufficient to support a finding as to the deviant appeal of "Erotic Hands—Parts I and II" and as to the finding that defendants possessed the films seized in vault No. 209 with the intent to distribute them is not supported by the record.

When faced with a contention of insufficiency of evidence following conviction, the reviewing court's power on appeal is limited to a determination of whether substantial evidence, direct or indirect, supports the judgment not whether the evidence proves guilt beyond a reasonable doubt (*People* v. *Anderson* (1974) 38 Cal.App.3d 952 [113 Cal.Rptr. 729]; *People* v. *Standifer* (1974) 38 Cal.App.3d 733 [113 Cal.Rptr. 653]), and a verdict will not be set aside for insufficiency of the evidence unless it appears that upon no hypothesis whatever is there substantial evidence to support it (*People* v. *Collins* (1975) 44 Cal.App.3d 617 [118 Cal.Rptr. 864]; *People* v. *Whittaker* (1974) 41 Cal.App.3d 303 [115 Cal.Rptr. 845]).

Penal Code section 311, subdivision (a) (1), provides that predominant appeal to prurient interest is judged with reference to average adults unless, from the nature of the film and circumstances of its distribution, it appears that it was designed for a clearly defined deviant group.[8]

The films "Erotic Hands—Parts I and II" (counts VI and VII) contain the act of "fist insertion," the insertion of the fingers, hand, wrist and/or forearm of one individual into the anus of another person. Defendants argue that the films appealed solely to a deviant group rather than to average persons.

I conclude that the testimony of prosecution witnesses Officer Weller,[9] Dr. Victor B. Cline[10] and Dr. Thomas Von Dedenroth[11] constitutes substantial evidence to support the jury's finding on the films "Erotic Hands—Parts I and II" as to the requisite deviant appeal of the film and that the evidence both direct and indirect pertaining to the entire course of conduct of defendants relative to the films as heretofore discussed constitutes substantial evidence to support the finding of intent to distribute them.

---

[8]The trial court properly instructed the jury in this respect as follows:

"There has been some evidence in this case attempting to show that the intended and probable recipients of . . . 'Erotic Hands, Part I' and 'Erotic Hands, Part II,' were members of a deviant sexual group. If you find from all the evidence that this was the case, then you are to determine whether the material in any or all of the aforementioned films appeals to the prurient interest, in terms of the average member of the deviant group and not the average adult person in the community."

"If you find that certain films are directed at clearly deviant groups and if you find that your experience is inadequate to judge whether the materials appeal to the prurient interest of the average member of such intended recipient group, then you may rely upon such expert testimony as was presented as to what appeals to the prurient interest of the average adult member of such group."

"If you determine either, that the film in question did not appeal to the prurient interest of the average adult member of such intended recipient group, or that the evidence was insufficient to enable you to make a determination one way or the other, then you must find the defendants not guilty as to those films in counts 5, 6, and 7 [V, VI and VII]."

[9]Officer Weller testified about a group of homosexuals, self-styled as "Fist Fuckers of America," present in Southern California, which were a bizarre rather than a deviant group and in addition to fist insertion, their sexual conduct included infliction of injury or pain as well as urination and defecation on each other.

[10]Dr. Cline, a clinical psychologist, testified that to the average adult person in California, applying contemporary standards, the predominate appeal of the depictions in these films was to a prurient interest and in essence appealed to an interest in sadomasochism.

[11]Dr. Von Dedenroth, a psychiatrist, testified that the appeal that predominates these films would be to the average adult's prurient interest in that it conveys the concept that sex *should* be associated with violence in order to be enjoyable.

## VIII

Finally, a review of the record discloses that the police officers made a good faith and conscientious effort to comply with law while conducting their intensive 10-day investigation as evidenced by their obtaining 4 separate search warrants supported by lengthy affidavits. After careful consideration of the affidavits, Judge Younger properly found that probable cause existed for the warrants and the warrants withstood defendants' pretrial motion to suppress certain evidence before Judge Tevrizian.

Defense counsel left no legal or technical stone unturned. They first moved to quash the jury panel before Judge Spencer who after a 2-day hearing and over 450 pages of reporter's transcript denied the motion. (See discussion, *ante.*) Defendants then over a 5-day period before Judge Tevrizian made a series of pretrial motions covering 475 pages of reporter's transcript.

The jury trial itself lasted 7 days in Judge Tevrizian's court covering over 1,200 pages of testimony. At the conclusion of the matter, the reporter's transcript contains the following colloquy between court and counsel:

"THE COURT: All right. I am going to agree with the defense on this. I don't think it would serve the interest of justice really to further prosecute Counts II, III, and V. This was a very long, protracted trial. I think both sides had their best shots.

"Mr. Robinson, I think you did a good job as a prosecutor in this case. You were prepared. Defense, also, likewise did a good job. I was very impressed with the whole trial. The jury was an intelligent jury. We had three, I believe, educators, one Ph.D. on the jury, people from all walks of life, various economic levels, educational levels.

"All right. The Court, on its own motion, will then dismiss Counts II, III, and V pursuant to Penal Code section 1385.

". . . . . . . . . . . . . . . . . .

"MR. ABELSON [defense counsel for defendants Arno and Sinopoli]: I might say, as this lengthy record ends, which I am sure will eventually be read by some appellate court, counsel in this case unanimously could not have found a better judge to try any kind of a case in front of, a judge who was as fair to the defendants and gave the defendants the impression and counsel and the jury fairness, which is the crux of our system.

"THE COURT: I appreciate that comment very much, Mr. Abelson.

"DEFENDANT SINOPOLI: I'd like to thank you, your Honor, too.

"DEFENDANT STEER: Thank you, your Honor.

"MR. ROBINSON [deputy city attorney]: I would concur with that on behalf of the People . . . ."

I conclude that the police officers did not conduct themselves unreasonably at any phase of their investigation nor did they violate defendant Arno's "reasonable expectation of privacy." The defendants and each of them were fairly tried and justly convicted.

I have heretofore addressed in some detail the specific issue upon which the majority opinion based its reversal and treated more briefly the other issues raised on appeal. I now set forth additional points of disagreement with the majority opinion which are generally of a policy nature.

The majority opinion appears to me to be somewhat unclear and contains some contradictory statements. However, as I read it, it has either misapplied the irrational exclusionary rule (see my dis. opn. in *People v. Swearingen* (1978) 84 Cal.App.3d 570, 578-582, fns. 3, 4 [148 Cal.Rptr. 755]) as hereinbefore discussed *or* has ignored judicial precedent which holds (1) that there is no set formula for determining "reasonableness" and requires that it be decided on the facts and circumstances of each case (*People v. Berutko, supra,* 71 Cal.2d 84) and (2) that it is our duty on appeal to uphold a trial court's ruling on a motion to suppress evidence if it is supported by substantial evidence, express or implied (*People v. Superior Court (Keithley), supra,* 13 Cal.3d 406).

However, whether the majority has departed from legal precedent or not, an attempt has obviously been made to fashion a new formula in respect to the use of binoculars by law enforcement officers. In my opinion the new formula advanced is unwise and not in the best interest of sound public policy in that it unduly restricts law enforcement officers' use of a vital tool (binoculars) in their war against the expanding organized crime and vice problem.

The majority opinion's new formula draws a distinction between crimes involving a "substantial risk to life, person or property" and those crimes which do not involve such characteristics. The opinion indicates that it would be impermissible for police officers to use binoculars to aid their vision while surveilling individuals reasonably suspected of engaging in the latter group of crimes (i.e., those *not* involving a "substantial risk to life, person or property") if the object of their view is outside the range of the optically unaided eye or apparently unless "the purpose of the optically aided view is to permit clandestine police surveillance of that which could be seen from a more obvious vantage point without the optical aid."

Accordingly, if hypothetically in the case at bench Officer Johnson had observed with the aid of the binoculars from his vantage point a rape in progress or a body being dismembered or an arsonist at work in suite 804, his optically aided observations may have been admissible. However, since the defendants were *only* engaging in the crime of distributing hard-core pornography his optically aided observations constituted a "quintessential"[12] violation of defendants' constitutional right of privacy and are inadmissible. Thus, the majority opinion as I construe it has the net practical result of unduly restricting law enforcement officers' utilization of binoculars while engaged in their official duties of detecting and acquiring evidence of a wide range of criminal activities involving pornography, narcotics, prostitution, pimping, bookmaking and the like, irrespective of the magnitude of the operations. This latter group of crimes has been loosely referred to as "victim-less crimes" which is a gross misnomer. There are no victim-less crimes. Society is the victim.

[12]"Quintessence [noun]—1: the fifth and highest essence in ancient and medieval philosophy that permeates all nature and is the substance composing the heavenly bodies; 2: the essence of a thing in its purest and most concentrated form; 3: the most typical example or representative—quintessential [adjective]." (Webster's New Collegiate Dict. (7th ed. 1972) p. 702.)

The majority opinion in my view unduly restricts law enforcement officers from protecting society's interest in respect to the commission of the types of crimes mentioned above.[13]

I would affirm the judgments of conviction.[14]

A petition for a rehearing was denied April 3, 1979, and respondent's petition for a hearing by the Supreme Court was denied May 3, 1979.

---

[13]Here in my opinion we once again continue to march lockstep 180 degrees in the wrong direction. Once again after a great expenditure of effort and public funds another reversal joins the wreckage in the "giant junkyard" of the judicial landscape by reason of an upside-down system of criminal justice which diverts the focus of criminal prosecution from the guilt or innocence of the defendants to a trial of the police.

[14]I have heretofore eschewed responding to footnote 2 of the majority opinion *in kind* since it would be beneath the dignity of this office. Although I still will not respond *in kind*, with the filing of a modification to footnote 2 on March 20, 1979, some comment is compelled.

I decry the lack of propriety, collegiality and judicial temperament. displayed in footnote 2. I abhor the loss of public respect for the legal profession and the judiciary footnote 2 has engendered by reason of the report in the Los Angeles Times on March 13, 1979 (circulation 1,034,329). One certainly cannot fault the Los Angeles Times for using an *English dictionary* (Webster's) since California published opinions for over 125 years have been written in *English* and our jurisdiction obviously does not extend seven thousand miles to the Rhine in Germany.

I construe the *Ginsberg* reference in footnote 2 within the context of the case at bench as a personal affront to every California citizen and their duly elected representatives in the California State Legislature who have deemed it a wise public policy to enact our criminal obscenity laws and to all public servants charged with the responsibility of enforcing those laws. It is no wonder that California has the odious distinction of being the porno capital of the world.